**Melissa G. RIGGS, Plaintiff,**

v.

**Otis Edward SMITH, American Chambers Life Insurance Company, and Protective Life Insurance Company, Defendants.**

No. 95–14270–CIV.

United States District Court,
S.D. Florida.

Jan. 22, 1997.

Jeffrey M. Liggio, West Palm Beach, FL, Roger N. Messer, Messer and Ray, Port St. Lucie, FL, for Plaintiff.

Jay S. Blumenkopf, Kenneth Strick, Proskauer Rose Goetz & Mendelsohn, LLP, Boca Raton, FL, Harold S. Stevens, Conroy, Simberg and Lewis, West Palm Beach, FL, for Defendants.

### ORDER GRANTING MOTION TO REMAND

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon plaintiff's Motion to Remand [DE 48], filed August 28, 1996. The Court held an evidentiary hearing on January 13, 1997, at which time it deferred ruling on the motion. This Order sets forth the Court's factual findings [1] and conclusions of law.

### I. *Procedural Background*

This case began in the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida when Melissa Riggs filed a five-count complaint against the various defendants. In brief, Ms. Riggs alleges that defendants sold her an insurance policy providing major medical benefits, and then refused to cover her medical bills arising from an automobile accident that left Ms. Riggs paraplegic. The five counts of the complaint contain four legal theories of recovery,[2] all predicated on state common law. Count II alleges breach of contract, Count III asks for a declaratory judgment as to coverage, Count IV demands specific performance of the policy's terms, and Count V alleges that Otis Smith, the agent who sold Ms. Riggs the policy, negligently failed to procure adequate health coverage for her. The Complaint also affirmatively alleges that the Federal Employee Retirement Security Act, 29 U.S.C. § 1001 *et seq.,* does not preempt Ms. Riggs's common law claims.

Defendants beg to differ. On September 29, 1995, they filed a Notice of Removal, bringing this case into federal court. The Notice asserts ERISA as the basis for the exercise of this Court's jurisdiction. Defendants allege that Ms. Riggs participated in a group health plan, which constitutes a employee welfare benefit plan under ERISA. On the basis of this ERISA preemption theory, defendants moved for summary judgment. By Order dated September 17, 1996, the Court denied the defendants' motions for summary judgment, and set this case for an evidentiary hearing on the jurisdictional issue [3] of whether or not ERISA preempts Ms. Riggs's common law claims. Having concluded that hearing, the Court now makes the following findings of fact.

### II. *Findings of Fact*

1. In June of 1994, Melissa Riggs worked in an insurance telemarketing office located at 10790 South Federal Highway in Port St. Lucie, Florida.

2. Count I contains only general allegations.

3. Defendants only assert federal question jurisdiction, i.e. ERISA, as a jurisdictional basis. Although the amount in controversy surely exceeds $50,000, complete diversity apparently is lacking.

---

1. The Court, not a jury, must make any necessary factual findings regarding jurisdiction. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.) ("The unique power of district courts to make factual findings which are decisive of jurisdiction is, therefore, not disputed.") (citations omitted), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).

2. Gregg Kronman, Director of Sales for Southeastern Region for ACSIA Insurance Services ("ACSIA"), managed the office. In addition to serving as a director for ACSIA, Mr. Kronman ran his own company, Future Assurance Corporation ("FAC").

3. The office where Ms. Riggs worked serviced both ACSIA and FAC. Mr. Kronman's dual role as director of ACSIA and president of FAC, and the office's servicing of both companies, makes difficult the determination of who was Ms. Riggs's employer.

4. The following indicia suggest that ACSIA, and not FAC, employed Ms. Riggs.

a. The door at the 10790 South Federal Highway office was labeled "ACSIA Insurance Services". No other signs appeared in the building.

b. Receptionists answered the office telephones "ACSIA," not "FAC."

c. Ms. Riggs reported directly to Sally DeJesus, who ran the office's day-to-day operations, including the hiring and firing of office staff. While Ms. DeJesus appeared on the FAC payroll, Ms. Riggs's paychecks and tax forms came from ACSIA's California offices.

d. FAC did not claim any employees on its Federal Tax Return.

e. On May 8, 1996, Ms. Riggs received a letter from ACSIA in California noting that she resigned from her employment with ACSIA on July 7, 1995. The letter solicits Ms. Riggs's application for renewed employment with ACSIA.

f. When any office employee was hired or fired, Sally DeJesus reported this to ACSIA in California.

g. The job application forms that the office's employees filled out came from ACSIA in California.

h. ACSIA provided worker's compensation insurance for the office employees.

5. For reasons explained in the Conclusions of Law section, the Court does not find the issue of who employed Ms. Riggs to be dispositive. However, for purposes of the record, the Court finds as a matter of fact and of law that ACSIA, and not FAC, employed Ms. Riggs.

6. Neither ACSIA nor FAC offered any of its employees any health insurance. At the request of various employees, Mr. Kronman directed Ms. DeJesus to see if insurance could be procured on behalf of the employees.

7. Ms. DeJesus first contacted ACSIA in California. ACSIA informed her that it was a member of a California HMO, and that it could not provide the coverage it provided to its California employees to its Florida employees.

8. Upon Mr. Kronman's direction, Ms. DeJesus contacted Ms. Lisa White, an insurance agent employed by the O. Edward Smith Insurance Agency. Ms. DeJesus explained to Ms. White the relationship between ACSIA and FAC and the employees' request for coverage, and asked for insurance quotes on behalf of the employees.

9. Ms. White quoted several different plans to Ms. DeJesus. The American Chambers plan, which the office's employees ultimately accepted, has the following characteristics. The "employer" applicant must be a member of the Chamber of Commerce and must be a member of United Chambers Insured Plan Trust. Although most of the members of the American Chambers plan are employers, American Chambers will also write coverage for independent contractors who are members of the Chamber of Commerce. The insureds need not be subject to ERISA to become insured under the American Chambers plan.

10. Upon receiving the quotes, Ms. DeJesus scheduled a time when Ms. White could come into the office and present the various options to the employees. When Ms. White presented the various plans, the employees settled on the American Chambers plan. Ms. DeJesus then collected the application forms from the employees and sent them to Ms. White.

11. In order for the employees to be eligible for the American Chambers plan, Mr. Kronman executed a Member Firm Participation Agreement representing FAC to be the employer of the eligible employees. Similarly, Ms. Riggs executed an enrollment form showing FAC as her employer.

12. American Chambers's had either actual or constructive knowledge of the relationship between ACSIA and FAC, and therefore knew that the employment status of the applicant employees was less than clear. American Chambers willingly participated in the fiction that FAC employed the covered employees.

13. FAC made no direct contribution to the funding of the policies. Although FAC remitted the dues to American Chambers, the employees paid the policy dues out of their own pockets. FAC received no compensation from the plan. FAC did pay to join the chamber of commerce. The evidence did not clearly indicate who paid the monthly twenty dollar administrative fee, although Ms. Baldwin's deposition indicated that the employees did. The Court makes no finding of fact on this point, but merely notes that defendants bear the burden of sustaining jurisdiction, and have not met their burden of production as to this point. Accordingly, the Court finds that defendants have not shown that FAC made any monetary contribution to the plan.

14. Participation in the program was purely voluntary on the part of the employees. Some chose to participate, and others chose not to participate.

### III. Legal Standard on a Motion to Remand

Under the federal removal statute, "an civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States." 28 U.S.C. § 1441(a). However, "[a] removing defendant has the burden of proving the existence of federal jurisdiction." *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353 (11th Cir.1996). Thus, on this motion for remand, defendants bear the burden of proving that ERISA preempts Ms. Riggs state law claims.

### IV. Conclusions of Law

█ The instant jurisdictional issue has been sidetracked by several relevant but non-dispositive issues. In particular, the parties have vigorously disputed whether Ms. Riggs was employed by ACSIA or by FAC. The insurance defendants essentially have taken the position that Ms. Riggs must be estopped from denying that FAC employed her because she indicated FAC as her employer on the enrollment form. The Court, however, believes that the equitable doctrine of unclean hands prevents American Chambers from embracing the equitable doctrine of estoppel under these circumstances.[4] The Court does not mean to insinuate that either Ms. Riggs or American Chambers necessarily was guilty of some fraudulent or inequitable conduct in stating on the application form that Ms. Riggs was employed by FAC, or in accepting the application. Given the perplexing (from a legal viewpoint) set-up of the office, knowing exactly who employed whom is no easy task. However, *if* inequitable conduct transpired, American Chambers participated in it as much as Ms. Riggs.

In any event, the Court does not believe that the issue of who employed Ms. Riggs should dominate this jurisdictional motion.[5] For the reasons explained below, the Court finds that the applicability of ERISA's safe-harbor provision should be the focus of the discussion, and this provision applies even if FAC should be considered Ms. Riggs's employer.

### A. ERISA Essentials

"In enacting ERISA, Congress established a regulatory regime governing 'employee benefit plan[s].'" *Randol v. Mid–West Nat'l Life Ins. Co. of Tennessee*, 987 F.2d 1547, 1549 (11th Cir.), *cert. denied*, 510 U.S. 863,

---

4. "The equitable doctrine of unclean hands provides that [ ] '[O]ne who has been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law." *In re Garfinkle*, 672 F.2d 1340, 1346–47 n. 7 (11th Cir.1982), *citing Peninsula Land Co. v. Howard*, 149 Fla. 786, 6 So.2d 384, 389 (1941).

5. Of course, if FAC provided the insurance plan but did not employ Ms. Riggs, ERISA would not preempt Ms. Riggs state law claims. *See Nichols v. Southeast Health Plan of Alabama, Inc.*, 859 F.Supp. 553 (S.D.Ala.1993) (finding no ERISA preemption where co-owner of real estate company that employed plaintiff paid employee's insurance premiums out of her personal checking account).

114 S.Ct. 180, 126 L.Ed.2d 139 (1993), *citing* 29 U.S.C. § 1003. Whether or not ERISA governs a particular insurance dispute "depends on whether the insurance policy at issue qualifies as an 'employee benefit plan.'" *Id.* If the policy does qualify as an "employee benefit plan," then ERISA preempts any state common law or statutory provision regulating the plan. 29 U.S.C. § 1144(a); *see also Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 62, 107 S.Ct. 1542, 1545–46, 95 L.Ed.2d 55 (1987). "Thus ERISA preempts all state laws insofar as they apply to employee benefit plans even if those laws do not expressly concern employee benefit plans and amount only to indirect regulation of such plans." *Howard v. Parisian, Inc.,* 807 F.2d 1560, 1563 (11th Cir.1987). Conversely, if the policy does not qualify as an "employee benefit plan," it continues to be governed by relevant state law.

Employee benefit plans include "employee welfare benefit plans," 29 U.S.C. § 1002(3), which the statute defines as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or beneficiaries, through the purchase of insurance or otherwise," enumerated categories of benefits, including medical insurance. 29 U.S.C. § 1002(1). The Eleventh Circuit has analyzed the statutory components of a welfare plan as follows: "By definition, then, a welfare plan requires (1) a "plan, fund, or program" (2) established or maintained (3) by an employer or any an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care [remaining examples excluded] (5) to participants or their beneficiaries." *Donovan v. Dillingham,* 688 F.2d 1367. "Whether an ERISA plan exists is a question of fact." *Gahn v. Allstate Life Ins. Co.,* 926 F.2d 1449, 1451 (5th Cir.1991), *citing Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1082 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990).

## B. The Safe Harbor

Acting pursuant to it statutory authority, 29 U.S.C. § 1135, the Department of Labor has further fleshed out the definition of employee welfare plans subject to ERISA by promulgating the following "safe harbor" provision.

(j) *Certain group or group-type insurance programs.* For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which,

(1) No contributions are made by an employer or employee organization;

(2) Participation [in] the program is completely voluntary for employees or members;

(3) The sole function of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j).

This safe harbor provision clarifies "that group insurance programs meeting [the specified] requirements definitely do not qualify as ERISA plans." *Randol,* 987 F.2d at 1550. In order to qualify for the safe harbor, an insurance policy must meet all four criteria spelled out in the regulation. *See id.* at 1552 (insurance plan governed by ERISA where it failed one of safe harbor requirements); *Gahn,* 926 F.2d at 1452 ("The group insurance plan must meet all four criteria in order to be exempt from ERISA.") (citation omitted). Conversely, once an insurance plan meets all four criteria of the safe harbor

provision, the Court's inquiry concludes, and ERISA is conclusively deemed not to preempt a plaintiff's state law claims.

## C. Is Ms. Riggs Docked in the Safe Harbor?

■ Upon review of the established facts in this case, the Court concludes that the insurance policy purchased by Ms. Riggs easily meets the second and fourth safe harbor criteria. Defendants do not dispute that all employees who chose the American Chambers plan did so voluntarily, and that FAC received no pecuniary compensation for allowing its name to be used as the relevant employer. Defendants vigorously argue, however, that the plan fails the first and third prongs of the safe harbor test, because FAC allegedly contributed money to the plan, and actively endorsed it. The Court will consider each of these prongs in turn.

In order for the safe harbor provision to apply, "[t]he employer must not subsidize the purchase of insurance." *Smith v. Jefferson Pilot Life Ins. Co.*, 14 F.3d 562, 568 (11th Cir.) (citation omitted), *cert. denied*, 513 U.S. 808, 115 S.Ct. 57, 130 L.Ed.2d 15 (1994). Defendants argue that FAC did subsidize the insurance by paying the fee to join the Chamber of Commerce, and by paying the monthly administrative fee. In the Findings of Fact section, the Court found that defendants failed to carry their burden of proving that FAC, and not the employees, paid the administrative fee. That leaves only the fee for joining the Chamber of Commerce. The Court thinks it highly improbable that Congress or the Department of Labor ever intended that the payment of a *de minimis* membership fee to an organization such as the Chamber of Commerce would resolve the question of ERISA preemption. This present situation is a far cry from *Randol*, where each month the employer contributed $75 toward the employee's health coverage. 987 F.2d at 1552. Even assuming that FAC only paid the Chamber of Commerce fee in order to allow the employees to become eligible for participation in the American Chambers plan, by joining the Chamber of Commerce FAC became entitled to a number of benefits wholly unrelated to health insurance for its purported employees. To the extent that this was a subsidy of the insurance plan, it was so indirect and *de minimis* as not to constitute a "contribution" within the meaning of the first prong of the safe harbor provision.

■ The third prong of the safe harbor test is a closer call. Was FAC's sole function with respect to the program, without endorsing the program, to permit American Chambers to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to American Chambers? *See* 29 C.F.R. § 2510.3–1(j)(3). This issue turns on the meaning of the word "endorsing." The Court has found that upon the employees' request, Sally DeJesus procured health insurance quotes from Lisa White, and arranged for Ms. White to come and present the most favorable options to the employees. Did Sally DeJesus act sufficiently as a gatekeeper to the various insurance options so as to "endorse" the American Chambers plan within the meaning of the safe harbor provision?

■ Before examining the most recent circuit court precedents on this issue, the Court will address one issue that the parties have debated at some length. The question involves the relevance of the fact that American Chambers, and not FAC, acted as plan administrator. The Court finds that while this fact does not conclusively prove that FAC did not endorse the plan, it is at least one relevant consideration. Although ERISA may not require that the employer play any role in administering the plan in order for it to be considered an ERISA employee welfare benefit plan, *see Donovan*, 688 F.2d at 1374, whether or not the employer administered the plan plays some role in the endorsement inquiry. *C.f. Sarraf v. Standard Ins. Co.*, 102 F.3d 991 (9th Cir. 1996) (plan administrator endorses the plan within the meaning of safe harbor provision). Ms. Riggs' case, therefore, is somewhat strengthened, and defendants' case somewhat weakened, by the fact that American Chambers administered the plan.

The plan administrator issue does not end the endorsement inquiry. The Court still

must address the precise question at issue: what actions on the part of an employer constitute "endorsement" within the meaning of the safe harbor's third criterion? Several federal circuit courts have recently considered this endorsement issue at some length, although the Eleventh Circuit appears not yet to have reviewed this question in any detail. In *Hansen v. Continental Ins. Co.*, 940 F.2d 971 (5th Cir.1991), the Fifth Circuit found that an insurance plan constituted an employee welfare benefit plan within the meaning of ERISA, under the following circumstances:

> The "Group Accident Insurance Plan" was presented to Fairfield employees as a supplement to those other benefit plans. A booklet bearing Fairfield Industries' name and corporate logo was given to all employees; the booklet encouraged the employees to consider carefully participating in the group accidental death and dismemberment plan, as it would be "a valuable supplement to your existing coverages."

*Id.* at 978.

Similarly, the First Circuit's opinion in *Johnson v. Watts Regulator Co.*, 63 F.3d 1129 (1st Cir.1995) provides a comprehensive definition of the meaning of endorsement within the ERISA context. In *Johnson*, the court held that the district court had not clearly erred in finding that ERISA did not preempt under the following circumstances:

> Although Watts [the employer] distributed the sales brochure, waiver-of-insurance cards, and enrollment cards, those efforts were undertaken to help CIGNA [the insurer] to publicize the program; the documents themselves were prepared and printed by CIGNA, and delivered to Watts for distribution. Watts recommended enrollment via a cover letter ... written on the letterhead of Watts Industries and signed by its vice-president for financial matters. CIGNA typeset the letter and incorporated it into the cover page of the brochure. The letter explicitly informed Watts' employees that the enrollment decision was theirs to make. Watts nowhere suggested that it had any control over, or proprietary interest in, the group insurance program. And, finally, neither the letter nor any other passage in the brochure mentioned ERISA.

63 F.3d at 1136. Distinguishing *Hansen*, the court noted that the district court had permissibly found that "Watts' cover letter fell short of constituting an endorsement. The court pointed out that neither the letter nor the brochure expressly stated that the employer endorsed the program." *Id.* The circuit court based its holding primarily on two considerations. First, "endorsement of a program requires more than merely recommending it. An employer's publicly expressed opinion as to the quality, utility an/or value of an insurance plan, without more, while relevant to (and perhaps probative of) endorsement, will most often not indicate employer control over the plan." *Id.* Second, the court noted that the employer's administrative activities "such as issuing certificates of coverage and maintaining a list of enrollees are plainly ancillary to a permitted function (implementing payroll deductions)." *Id.* In sum, "as long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under section 2510.3–1(j)(3)." *Id.* at 1134.

Finally, in *Thompson v. American Home Assurance Co.*, 95 F.3d 429 (6th Cir.1996), the Sixth Circuit reviewed *Hansen* and *Johnson*, and reversed a granting of summary judgment where the district court had found ERISA preemption under the following facts:

> Burns' [the employer] personnel administrator gave new employees information regarding the policy, including a brochure which bore Burns' company name on the front cover. Each new employee decided whether to enroll in the policy, and, if he or she chose to do so, returned an enrollment card to the administrator, who entered the information into a computer system so that payroll deductions could be made.

*Id.* at 431. Noting that "the relevant framework for determining if endorsement exists is to examine the employer's involvement in the creation or administration of the policy

from the employees' point of view," *id.* at 437, *citing Johnson,* 63 F.3d at 1134 & 1137 n. 6, the court found that the "evidence presents a material question of fact as to whether Burns endorsed the policy under the DOL regulations." *Id.* at 437.

Upon the persuasive authority of these cases, the Court concludes that FAC did not endorse the American Chambers plan within the meaning of the safe harbor provision. Like the employer in *Johnson,* FAC merely provided the insurer with an opportunity to present various insurance options to the employees.[6] The entire impetus for procuring health coverage came from the employees. FAC performed the minor administrative function of getting quotes and arranging a time for American Chambers's agent to present its plan. There is no evidence that FAC steered the employees toward any particular option over another. As in *Johnson,* "the employer separate[d] itself from the program, making it reasonably clear that the program [was] a third party's offering, not subject to the employer's control." 63 F.3d at 1137. In short, FAC did not endorse the American Chambers plan. Accordingly, the policy falls within the ERISA's safe harbor provision, and the motion to remand must be granted.

### Conclusion

The Court has considered the motion, and the pertinent portions of the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that plaintiff's Motion to Remand [**DE 48**] be, and the same is hereby **GRANTED.** This case is hereby **REMANDED** to the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida. The Clerk of the

Court shall **CLOSE** this case and **DENY** all pending motions as moot.

---

6. The Seventh Circuit has held that the fact that an employer offers its employees a choice of plans does not necessarily mean that the employer does not endorse the plans. *Brundage–Peterson v. Compcare Health Servs. Ins. Corp.,* 877 F.2d 509, 511 (7th Cir.1989) ("The fact that ... the employer offered a choice of plans rather than a single plan can make no difference, for it is commonplace to offer employees benefit options."). However, in that case the employer had specifically contracted with the various insurance companies to provide coverage to its employees. *Id.* These "contracts 'established' a plan for specified employees having an elective feature which did not in our view affects is character as a plan." *Id.* In the instant case, FAC did not contract with American Chambers until the employees had voluntarily accepted a plan. *Brundage–Peterson,* therefore, is inapposite.