**Pamela EDWARDS, Plaintiff,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.**

No. 02–80359–CIV.

United States District Court, S.D. Florida.

July 16, 2002.

Allison J. Stahl, Silber & Valente, West Palm Beach, FL, for plaintiff.

W. Edward McIntyre, Daniel Alter, Bunnell, Woulfe, Kirschbaum, Keller, McIntyre & Gregoire, P.A., Fort Lauderdale, FL, for defendants.

### ORDER GRANTING MOTION TO REMAND

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon several pending motions, the most significant being defendant Prudential Insurance Company of America ("Prudential") Motion to Dismiss, filed April 22, 2002 (DE# 2); and plaintiff Pamela Edwards's ("Edwards") Motion to Remand,

filed May 14, 2002 (DE# 7).[1] The Court has reviewed the record, the submissions of counsel, the relevant statutory and case-law, and is otherwise fully advised in the premises. The complaint, consisting of one count for breach of contract, was originally filed in state court, after which Prudential removed it to this Court. The removal was predicated solely on complete federal preemption—federal question jurisdiction. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 64–67, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Because the Court finds that the statutory safe harbor provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, is applicable to the disability plan involved here, there is no federal subject matter jurisdiction over this action and the case must be remanded to the state forum from which it was removed.

## I. *Facts*

The facts of this controversy are relatively scant, which works to the detriment of the removing party, Prudential, as Prudential bears the burden of establishing legitimate federal jurisdiction. These facts are culled from the disability plan itself, copies of which both parties have submitted in connection with the relevant motions, as well as from affidavits from Jason Hall, Prudential's Account Executive for the Florida Education Association, Inc.'s ("FEA") group insurance policy, and Pamela Edwards, the plaintiff. Additionally, Prudential has filed a Supplemental Affidavit of Jason Hall, further explaining the situation now before the Court.

Edwards, a resident of Palm Beach County, was employed for many years as a teacher with the Dade County School Board. Edwards then allegedly became disabled so as to qualify for benefits under the relevant short-term disability plan ("the Plan") issued by Prudential. It is undisputed that enrollment in the Plan was completely voluntary.

Hall, whose affidavit and supplemental affidavit Prudential filed in support of its motion to dismiss and in opposition to Edwards's motion to remand, is Prudential's Account Executive assigned to the FEA account. According to Hall, FEA is "a private organization of employees from the Florida public school system" whose "business purpose is to serve as an advocate for K–12 public educators and the public education system in the State of Florida." The FEA is made up of several local affiliates, one of which being the United Teachers of Dade ("UTD"). Edwards was a member of the UTD. Membership in the FEA allows a participant to access certain insurance benefits at a discounted group rate.

Further, effective May 1, 1999, "FEA procured the ... [Plan] from Prudential to secure Short Term Disability benefits for its membership." The premiums for the Plan are paid by FEA member contributions. FEA also notifies Prudential of who qualifies for participation in the Plan. According to the language of the Plan itself, "Covered Classes" are "[a]ll members of the FEA/UNITED as reported to Prudential," which meant that an enrollee "must be working for an Included Employer at least 20 hours per week."[2] FEA utilizes

---

1. Although Prudential has also filed motions to strike directed at the plaintiff's claim for attorneys' fees (DE# 3) and plaintiff's demand for a jury trial (DE# 4), the adjudication of the central issue (concerning whether the disability plan in question is subject to ERISA) in the motion to dismiss and motion to remand

obviates the need for the Court explicitly to rule on these latter motions.

2. There is no evidence that the FEA solicited this limitation, as opposed to Prudential itself making it part of Plan eligibility. For that matter, there is no evidence that the FEA actively solicited *any* of the Plan's compo-

the services of an insurance agency named Public Employee Services Company, Inc. ("PESCO") in presenting insurance-package presentations to its members. According to Hall's supplemental affidavit, FEA uses PESCO's services "for the purpose of making on-site presentations to public school teachers and enrolling them in *certain insurance plans* procured by FEA for the benefit of its members." (emphasis added).[3] PESCO also engages in the administrative aspect of arranging the payment of participants' premiums through payroll deductions.

Hall's supplemental affidavit also states that the presentation given by PESCO includes a statement that "6,000 FEA Members have already enrolled."[4] The Plan itself has a cover page with "Prudential" and the "Rock" symbol in the upper right-hand corner and "Florida Education Association/United" printed in the lower right-hand corner. It lists the Contract Holder as "FLORIDA EDUCATION ASSOCIATION/UNITED," and states that "[t]he Contract Holder has delegated certain administrative functions regarding the plan to the Plan Administrator." In the Certificate of Coverage section, the Plan states that "[t]he Prudential Insurance Company of America (referred to as Prudential) welcomes you to the plan" and that "Prudential will assist you in any way to help you understand your benefits." The Plan notifies participants of the possibility of continuing coverage: "You may continue your coverage when your coverage would otherwise have ended because you are no longer a member of the Florida Education Association/United due to the end of your employment." As for the payment of premiums, the Plan does not beat around the bush: "Your coverage is paid for by you." There is no mention whatsoever of any contributions by the FEA or by any other entity. Prudential submits no evidence that anyone but Pamela Edwards ever contributed to the premiums for her coverage under the Plan. The Plan states that "Prudential will make payments to you." Finally, the Plan contains some discussion of how the provisions of the federal Family and Medical Leave Act of 1993 may impact upon Plan benefits. At no point, however, does the Plan reference ERISA or describe any of its provisions.

Edwards, too, has submitted an affidavit. The affidavit is replete with statements that "to the best of [her] knowl-

---

nents. In terms of ERISA, it is one thing to say that an insurance policy is available only to certain employees of X. It is quite another to say that *X itself* has determined that an insurance policy is only available to certain of its employees. *Cf. Thompson v. American Home Assurance Co.*, 95 F.3d 429, 436 (6th Cir.1996) ("[W]here the employer plays an *active role* in either determining which employees will be eligible for coverage or in negotiating the terms of the policy or the benefits provided thereunder, the extent of employer involvement is inconsistent with 'employer neutrality' and a finding of endorsement may be appropriate." (emphasis added)). Only the latter is inconsistent with an employer's duty to retain neutrality vis-à-vis an insurance program such that the safe harbor provision, discussed *infra*, may be applicable.

3. This statement is noteworthy, for the use of the plural it implies that FEA provides its members with more than one option concerning available insurance plans. There is also no evidence that PESCO ever holds itself out to those in attendance at a given presentation to be any type of agent for FEA.

4. The evidence submitted on this item is a print-out of a power-point image shown to potential enrollees. Above the quoted statement, and in a font approximately twice the size, are the words "Prudential Financial" with the "Rock" symbol between them, and below the quoted statement (in a font approximately the same size thereof) is the name "Prudential Insurance Company of America."

edge" FEA did not participate in the management of the Plan and that FEA did not endorse the Plan. To the extent that Edwards is postulating on the interrelationship between Prudential and FEA, the Court credits the affidavit of Hall (Prudential's Account Executive for FEA) over that of Edwards. However, the affidavit is significant for what it lends to the determination of how a reasonable employee in Edwards's shoes would view the Plan and its endorsement—or lack thereof—by the FEA. Edwards states that she learned about possible enrollment in the Plan when told during a morning school announcement that a Prudential representative would come to the school to discuss disability insurance.

## II. *Law*

 Although many issues are addressed in the parties' various submissions, including the governmental plan exception to ERISA application, whether the disability plan involved qualifies under ERISA's definition of "plan, fund, or program," and what evidence a removing defendant must and may submit in support of the Notice of Removal (and *when* the defendant must submit such evidence),[5] the Court finds that the proper resolution of one particular issue is dispositive here—whether this short-term disability plan qualifies for the statutory safe harbor provision embodied in 29 C.F.R. § 2510.3–1(j). If not, there is no federal jurisdiction.[6] "As always, jurisdiction is a threshold inquiry that [a court is] required to consider before addressing the merits of any claim." *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 292 F.3d 1334, 1336 (11th Cir.2002); *see also Smith v. GTE Corp.,* 236 F.3d 1292, 1299 (11th Cir.2001) (raising federal jurisdiction issue *sua sponte* ).

**5.** In her reply memorandum in support of her motion to remand, Edwards does not respond to Prudential's cogent arguments concerning its evidence in support of the removal. Because of this, as well as the fact that the Court finds that even with the additional evidence, remand is required, the Court need not directly address this particular issue.

**6.** Neither party addresses the issue of diversity jurisdiction, and the Court shall not investigate the issue on its own. The Court also notes that this dispute raises an interesting tension in the law: On the one hand, it is quite clear that the burden of establishing removal jurisdiction rests squarely on the shoulders of the removing party, and any doubts should be resolved in favor of remand. *See, e.g., Leonard v. Enterprise Rent A Car,* 279 F.3d 967, 972 (11th Cir.2002) ("A removing defendant bears the burden of proving proper federal jurisdiction."); *University of So. Ala. v. American Tobacco Co.,* 168 F.3d 405, 411 (11th Cir.1999) ("Indeed, all doubts about jurisdiction should be resolved in favor of remand to state court."); *Fowler v. Safeco Ins. Co. of Am.,* 915 F.2d 616, 617 (11th Cir.1990) ("In a removal action, the burden is on the defendant, not the plaintiff, to plead the basis for jurisdiction."). On the other hand, courts must also be cognizant of and abide by Congress's ability to preempt completely certain fields, such as ERISA. *See, e.g., Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) ("In sum, the detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing [of the parties' respective needs].... The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."). Construing too heavily the burden placed on the removing defendant could mean that an action that Congress intended to be brought exclusively in a federal forum would be remanded to state court. However, allowing a defendant in any insurance action involving an employee and his or her policy to remove the case by chanting an "ERISA" mantra raises significant federalism concerns. (The Court is not stating that this characterizes the defendant's actions here, for the situation is admittedly a close one.) These at times apparently conflicting policies factor into the Court's analysis here.

Because based on the facts as here presented by the parties the Court finds that the safe harbor is implicated, the case shall be remanded.

 The Eleventh Circuit has described the purpose motivating congressional promulgation of ERISA as follows:

Congress enacted ERISA in 1974 to provide federal standards for the establishment and maintenance of employee pension and benefit plans. The legislation attempts to strike a balance between protecting employees and encouraging employers to voluntarily establish pension and benefit plans. An employer's decision to establish a plan is entirely voluntary, but once a plan is established, Congress wanted to "mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 375, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).

*Williams v. Wright,* 927 F.2d 1540, 1543 (11th Cir.1991) (some internal citations omitted). The ERISA statutory language describes "employee welfare benefit plan" and "welfare plan" as meaning

any plan, fund, or program which was heretofore or hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, prepaid legal services, or (B) any benefit

described in section 186(c) of this title. . . .

29 U.S.C. § 1002(1). In the seminal case of *Donovan v. Dillingham,* 688 F.2d 1367 (11th Cir.1982), the appellate court, sitting *en banc,* held that to qualify as a welfare plan possibly subject to ERISA, there must be "(1) a 'plan, fund, or program' (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing [benefits enumerated in § 1002(1)(A)](5) to participants or their beneficiaries." *Id.* at 1371. Further, "a plan, fund, or program falls within the ambit of ERISA only if the plan, fund, or program covers ERISA participants because of their employee status in an employment relationship, and an employer or employee organization is the person that establishes or maintains the plan, fund, or program." *Id.* In short, an ERISA-covered plan, fund, or program "is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* at 1373. However, the Court need not definitively decide whether the Plan meets this definition, for there is a dispositive antecedent question—does the statutory safe harbor, which if met takes such a plan, fund, or program outside the "ambit of ERISA," apply here? Under the facts as presented to the Court, the harbor is met.

 The Department of Labor, a body empowered under 29 U.S.C. § 1135 to promulgate rules interpreting ERISA, has issued certain safe harbor regulations, which "provide that group insurance offered to workers through their place of employment will *not* be deemed as ERISA plan if the insurance program satisfies certain enumerated criteria." *Randol v. Mid–West Nat'l Life Ins. Co. of Tenn.,* 987

F.2d 1547, 1549 (11th Cir.1993). The safe harbor regulation that is central to the case at bar reads as follows:

> For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
>
> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation in the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, *without endorsing the program*, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j) (emphasis added). The Court emphasizes the "endorsement" language because, as is the situation in the lion's share of cases addressing this safe harbor provision, the "endorsement" inqui-

ry is the one upon which the analysis acutely focuses. *See, e.g., Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1134 (1st Cir.1995) ("[T]he Department of Labor has called the employer neutrality that the third facet evokes 'the key to the rationale for not treating such a program as an employee benefit plan....'" (quoting 40 Fed.Reg. 34,526)).[7] The Department of Labor has issued some guidance in interpreting this provision, stating that "[a]n endorsement ... occurs if the employee organization urges or encourages members' participation in the program or engages in activities that would lead a member reasonably to conclude that the program is part of a benefit arrangement established or maintained by the employee organization." Advisory Op. No. 94–24A, 1994 WL 317906 (quoted in *Sanfilippo v. Provident Life & Cas. Ins. Co.,* 178 F.Supp.2d 450, 455 (S.D.N.Y.2002)). In short, "the hallmark of endorsement is a lack of employer neutrality with respect to the insurance plan or policy." *B–T Dissolution, Inc. v. Provident Life & Accident Ins. Co.,* 101 F.Supp.2d 930, 943 (S.D.Ohio 2000).

It is undisputed that FEA makes no contributions to the Plan, that Plan participation is completely voluntary, and that the FEA receives no profit-related consideration from Prudential. The parties vigorously debate, however, whether FEA "endorses" the Plan to its members, thus precluding qualification under the safe

---

7. In *Johnson,* the First Circuit described its view of the purpose behind this particular provision:

> The safe harbor dredged by the regulation operates on the premise that the absence of employer involvement vitiates the necessity for ERISA safeguards. In theory, an employer can assist its work force by arranging for the provision of desirable coverage at attractive rates, but, by complying with the regulation, assure itself that, if it acts only as an honest broker and remains neu-

tral vis-à-vis the plan's operation, it will not be put to the trouble and expense that meeting ERISA's requirements entails.

63 F.3d at 1133. Under the facts presented here to the Court, it appears that FEA was at most an "honest broker" with regard to the particular disability plan at issue. Nothing it has done has impermissibly crossed the line of neutrality drawn in the regulatory sands, and thus ERISA does not supply this Court with subject-matter jurisdiction over this controversy.

harbor provision. *See, e.g., Thompson v. American Home Assurance Co.,* 95 F.3d 429, 435 (6th Cir.1996) ("A policy will be exempted under ERISA only if all four of the 'safe harbor' criteria are satisfied."); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 977 (5th Cir.1991) (stating that insurance plans "which meet *each* of these criteria are excluded from ERISA's coverage" (emphasis added)); *Love v. Fortis Benefits Ins. Co.,* 120 F.Supp.2d 997, 1002 (M.D.Ala.2000) ("For the safe harbor provision to apply, all four elements must be met."); *Riggs v. Smith,* 953 F.Supp. 389, 393 (S.D.Fla.1997) ("In order to qualify for the safe harbor, an insurance policy must meet all four criteria spelled out in the regulation.").

The Eleventh Circuit has explained that in deciding whether something qualifies as a welfare plan subject to ERISA, *"Donovan* suggests a flexible analysis consistent with the legislative approach to ERISA." *Williams,* 927 F.2d at 1543. Using such a flexible approach in resolving the issue at bar appears sensible as well. The Court can find no reason not to apply, and some fact-intensive analysis from this and other circuits suggesting a reason *to* apply, such a flexible approach here. Because the issue the Court is called upon here to decide is a close one, a broad review of the caselaw interpreting the provision is in order.

▮ Initially, it is important to note that the viewpoint from which the "endorsement" inquiry is to be made is that of an "objectively reasonable employee" viewing the circumstances as a whole. *Johnson,* 63 F.3d at 1135. The courts have uniformly adopted this view as the best fit with the statutory language and guidance from the Department of Labor. *See, e.g., Thompson,* 95 F.3d at 437 ("Accordingly, in evaluating an employer's role in the creation and administration of a plan, emphasis should be placed on those circumstances which would allow an employee to reason-

ably conclude that the employer had compromised its neutrality in offering the plan."); *Adams v. Unum Life Ins. Co. of Am.,* 200 F.Supp.2d 796, 800 (N.D.Ohio 2002) ("The proper inquiry to determine if endorsement exists is to examine the employer's involvement in the creation or administration of the policy from the employees' perspective."); *Sanfilippo,* 178 F.Supp.2d at 455 ("Courts have adopted the employee-focused inquiry of the last clause of the DOL's test in the employer plan context, finding persuasive the agency's interpretation of the standard."); *Stoudemire v. Provident Life & Accident Ins. Co.,* 24 F.Supp.2d 1252, 1256–57 (M.D.Ala.1998) ("The employer's involvement will be evaluated from the point of view of a reasonable employee."). It is from this reasonable-employee viewpoint that the Court analyzes the evidence.

In *Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207 (11th Cir.1999), basically the only case from the Eleventh Circuit squarely to address the safe harbor provision in anything but a footnote, the court held that the pertinent regulation "explicitly obliges the employer who seeks its safe harbor to refrain from *any* functions other than permitting the insurer to publicize the program and collecting premiums." *Id.* at 1213. The *Butero* court concluded that this standard had not been met in part because the employer (Simply Fashion Stores, Ltd.) had "decided on key terms" of the insurance policy, such as "opt[ing] for a cheaper, nonportable policy." *Id.* at 1210; *see also Love v. Fortis Benefits Ins. Co.,* 120 F.Supp.2d 997, 1003 (M.D.Ala.2000) (finding endorsement in part because the employer "attempted to negotiate a change in the terms of the policy"). Further, after learning that the insurer was canceling the original policy, Simply Fashion chose to stay with the particular insurance provider at issue, apparently without employee input. *See*

*Butero*, 174 F.3d at 1210 (noting that although other insurance companies offering coverage were available, "Simply Fashion stayed with Royal Maccabees"). Additionally, Simply Fashion "deemed certain employees ineligible to participate [and] incorporated the policy terms into the self-described summary plan description," which Simply Fashion distributed to its employees under a document entitled the "Simply Fashion Stores, Ltd. Cafeteria Plan." *Id.* at 1213–14. Also, although not explicitly relying upon this particular fact in its holding, the *Butero* court noted that in distributing information concerning the policy change to its employees, Simply Fashion "issued a memorandum to its full-time employees ... announc[ing] that '*our* life insurance coverage'" was undergoing a change. *Id.* at 1210 (emphasis added). This, in this Court's view, is significant when considering the situation from the perspective of a reasonable employee receiving such information. *See Johnson*, 63 F.3d at 1137 ("In the difference between 'our plan' and 'a plan' lies the quintessential meaning of endorsement."). In conclusion, the *Butero* court found that the safe harbor was not available because "Simply Fashion did a lot more" than the regulation allowed. *Id.* at 1213.

In contrast, in the case at bar, there is no evidence that FEA played an active role in deciding on any "key terms" of the Plan. Further, the statement of Jason Hall that "certain insurance *plans* [were] procured by FEA for the benefit of its members" (emphasis added) indicates that the FEA did *not* unilaterally choose the particular Plan for all its members.[8] This is unlike *Butero*, where the evidence was that Simply Fashion (the employer) chose to stay with a particular provider and plan when given an option. At most, it appears that the FEA "procures" a variety of insurance possibilities from which its members may choose. Finally, here there is no showing that the FEA ever described the Plan using a possessive pronoun (the Plan states that "[t]he Prudential Insurance Company of America (referred to as Prudential) welcomes you to the plan" and that "Prudential will assist you in any way to help you understand your benefits"), nor is there evidence that the FEA included a description of the Plan in a benefits-package explanation. Accordingly, the Court finds the case at bar to be highly distinguishable from the circumstances confronting the Eleventh Circuit in *Butero*.

The Fifth Circuit addressed the safe harbor regulation in *Hansen v. Continental Insurance Co.*, 940 F.2d 971 (5th Cir. 1991). The case in *Hansen* had originally been filed in state court, from which the defendants timely removed it on the basis that the insurance plan in issue fell within the ambit of ERISA and the case was thus properly characterized as involving a federal question. *See id.* at 974. The plaintiff moved to remand, on the basis that the plan was not subject to ERISA, which the district court denied. On appeal, the Fifth Circuit first addressed whether the plan fell within the confines of the safe harbor regulation. As in the majority of cases, there was no dispute in *Hansen* that the plan there met the regulation's first, second, and fourth requirements (no employer contributions, voluntary employee participation, and no consideration given the employer, respectively). However, the court

---

8. *Cf. Riggs v. Smith*, 953 F.Supp. 389, 396 & n. 6 (S.D.Fla.1997) (finding no endorsement of plan where employer "merely provided the insurer with an opportunity to present various insurance options to the employees" and the employer "did not contract with [the insurer] until the employees had voluntarily accepted a plan"); *see also Love*, 120 F.Supp.2d at 1003 (concluding that there was endorsement in part because "the employer chose the insurer [and] chose the policy which would be provided ...").

found that the plan did not meet the "no-nendorsement" requirement. The employees there had been given a booklet entitled "Group Accident Insurance Plan for the employees of Fairfield Industries," which bore the employer's corporate logo. *Id.* at 974. The booklet stated that it "explain[ed] *our plan of Group Accident Insurance* " and that the employer "*ask[ed] that you* [the employee] *give the program careful consideration,*" as "[*t* ]*he insurance can be a valuable supplement to your existing coverages.*" *Id.* (alterations added, emphases in original). The appellate court stressed this hortatory language in concluding in short order that the plan did not meet the safe harbor "nonendorsement" requirement. *See id.* at 977 (describing how the booklet's language "encouraged employees" with respect to plan enrollment). Additionally, the court noted that the employer had a full-time benefits administrator devoted to the plan. *See id.* Based on these circumstances, the court held that the employer had indeed endorsed the plan and the safe harbor therefore did not exclude it from ERISA coverage.

In the situation at bar, the distinctions are evident. First, there is no FEA language describing the Plan as "our plan." *Cf. Johnson,* 63 F.3d at 1137 (discussing significance of such possessive phrasing). Second, the Court has been presented with no similar words of encouragement by the FEA urging the employees to enroll or even seriously to consider participation in the Plan. *See Stoudemire,* 24 F.Supp.2d at 1258 (concluding that the employer had endorsed the plan where the plan "was included and promoted by [the employer]

as part of its employee benefits plan, and [the employer] encouraged [its] employees to purchase the Policy").[9] The only thing close, and one of the primary bits of evidence upon which Prudential relies is that in a power-point presentation, there was a statement that "6,000 FEA Members have already enrolled." (There is no evidence as to how many FEA members were shown this presentation.) Although the Court does not find that such a factual statement could never constitute "endorsement" within the meaning of the safe harbor regulation, here it does not. A reasonable employee viewing such an unadorned statement would not conclude that the FEA has stamped this particular Plan with an imprimatur of endorsement.[10] Unlike the prodding language of the employer's booklet in *Hansen,* here there is no "so-should-you" aspect to be found in this phrase. Accordingly, the Court finds that a consideration of *Hansen's* rationale supports a conclusion of nonendorsement here.

In *Johnson v. Watts Regulator Co.,* 63 F.3d 1129 (1st Cir.1995), the First Circuit affirmed the district court's finding that the employer had not "endorsed" the relevant insurance plan where: (1) the insurer "drafted the policy and, presumably, set the premium rates," *id.* at 1135; (2) the insurer prepared the informational materials, and then delivered them to the employer to be distributed to the employees, *see id.* at 1136; (3) the employer collected premiums through certain payroll deductions and remitted them to the insurer, *see id.;* and (4) the employer performed numerous administrative functions, such as

---

9. Also of some significance to *Stoudemire's* holding was the fact that the defendant-insurers there had filed an affidavit of the employer's general counsel, "who state[d] that '[the employer] endorses and has approved the long term disability insurance coverage provided by [the employer] as a benefit to its

employees.' " 24 F.Supp.2d at 1257. There is no similar evidence from the FEA here.

10. Relevant to this consideration may be how many FEA members there are in total. This is not in evidence.

securing documentation for claims made, filling out the employer section of the claims form, making available claims forms to its employees, and "keeping track of employee eligibility." *Id.* Further, the employer in *Johnson* had "recommended enrollment via a cover letter" printed on its own letterhead. *See id.* The appellate court concurred with the district court's finding that this letter did not impermissibly cross the line of employer neutrality because "neither the letter nor the brochure expressly stated that the employer endorsed the program." *Id.* Based on these facts, the First Circuit held that the employer had not "endorsed" the insurance program.

Nothing in the case at bar distinguishes in any material way the reasons the behind the *Johnson* court's holding. The FEA did not assist in drafting the Plan's terms. Based on the evidence before the Court, it appears that the FEA performs fewer administrative tasks vis-à-vis the Plan than did the employer in *Johnson.* Finally, here there was no letter from the FEA concerning this Plan. The effect of the "6,000 FEA Members" phrase has been discussed above, and that discussion is equally pertinent here. Accordingly, the Court finds that *Johnson,* too, supports a conclusion that the FEA has not endorsed the Plan here involved.

In *Thompson v. American Home Assurance Co.,* 95 F.3d 429 (6th Cir.1996), the relevant facts were as follows: The plaintiff, Robert Thompson, voluntarily purchased insurance from his employer, Burns International Security Systems, Inc. "Burns' personnel administrator gave new employees information regarding the policy, including a brochure which bore Burns' company name on the front cover." *Id.* at 431. Each Burns employee paid for his or her own coverage, and Burns made no contributions thereto. *See id.* After addressing some procedural issues not ger-

mane to the instant analysis, the appellate court turned to the district court's grant of summary judgment in the beneficiary's favor. Such a ruling was necessarily anchored upon the district court's determination that the plan was subject to ERISA. *See id.* at 434. The Sixth Circuit held that the district court erred in determining that there were no genuine issues of material fact concerning the plan's ERISA—and safe harbor—qualifications, and thus vacated the entry of summary judgment and remanded the case back to the lower court.

The *Thompson* court first discussed the Fifth Circuit's *Hansen* opinion and the First Circuit's *Johnson* opinion insofar as those two cases interpreted the safe harbor regulation. The *Thompson* court then approved of the *Johnson* approach, *see id.* at 436, and concluded that "a finding of endorsement is appropriate if, upon examining all the relevant circumstances, there is some factual showing on the record of substantial employer involvement in the creation or administration of the plan." *Id.* Applying this standard to the record before it, the court found that it was "clear that no sufficient factual showing of substantial employer involvement in the creation or administration of the policy was made in this case to support a finding of endorsement under the DOL regulation." *Id.* at 437. Concerning the fact that Burns' name "was featured on the cover of the policy description," the court found that "this fact may be as consistent with identification as with endorsement. . . ." *Id.* Further, the policy information given to the employees "nowhere mention[ed] that the policy is subject to ERISA, nor [did] it set out a description of an employee's rights under ERISA." *Id.* Finally, the court noted that there was no evidence that Burns participated in "devising the terms of the policy or in processing claims . . . ." *Id.* Therefore, the court found that the employer did not as a matter of

law endorse the policy, and remanded the case back to the district court for further proceedings.

Many aspects are analogous to the situation at bar. Here, although the name "Florida Education Association/United" is printed on the lower right-hand corner of the plan, viewed from the perspective of a reasonable employee, this, like the name on the cover of the plan in *Thompson*, could be seen as much as simple identification as anything else. The writing is not in larger font than the "Prudential" name and "Rock" logo on the cover. Additionally, as in *Johnson*, there is *no* mention whatsoever anywhere in the Plan of ERISA, its procedures, or the employees' rights and responsibilities thereunder.[11] And again, Prudential has submitted no evidence that the FEA took an active role in hammering out what terms would be included in the Plan. Therefore, the Court finds that the reasoning of *Thompson* supports a conclusion that the safe harbor is here met, as FEA has not "endorsed" the Plan from the perspective of a reasonable employee.

In sum, viewed from the perspective of a reasonable employee, the evidence Prudential has presented in support of removal of this action indicates that the Plan falls within the safe harbor of 29 C.F.R. § 2510.3–1(j), outside of ERISA's parameter, and from this federal court back to the state forum for lack of subject matter jurisdiction. The FEA makes no contribution to the Plan's premiums, Plan participation is wholly voluntary, and the FEA receives no consideration from the Plan's operation. Further, from the "endorsement" inquiry it is apparent that the FEA did not actively solicit any terms of the Plan, never described the Plan in any manner consistent with endorsing it, and never recommended or used words of encouragement vis-à-vis Plan enrollment. Finally, the Plan itself gives no indication that its operation, enforcement, or interpretation is governed by ERISA. Based on this evidence taken as a whole, the Court finds that the FEA did not "endorse" the Plan within the meaning of the safe harbor.

### III. *Conclusion*

As evident from the above discussion, "[t]he facts of this case fall between the extremes of complete neutrality and total endorsement." *Stoudemire*, 24 F.Supp.2d at 1256. The Court travels only on the facts with which it is presented. Under the facts here, a thorough analysis reveals that the FEA has not "endorsed" the Plan within the meaning of the safe harbor regulation. Therefore, the Plan is not subject to ERISA, and federal question jurisdiction is lacking. This Court may then proceed no further save to say: Accordingly, it is hereby

---

**11.** Were the Court to choose one factor which, if evidenced, is dispositive of the endorsement inquiry, specific reference to ERISA in the relevant plan would surely be one of the finalists. *See Adams v. Unum Life Ins. Co. of Am.*, 200 F.Supp.2d 796, 801 (N.D.Ohio 2002) (repeatedly noting that the policy itself stated that it was governed by ERISA, that it was labeled as an "ERISA plan" and that "[t]herefore, a reasonable employee would conclude that … ERISA governed [t]he plan"); *Sanfilippo v. Provident Life & Cas. Ins. Co.*, 178 F.Supp.2d 450, (S.D.N.Y.2002) (finding endorsement where "[t]he Policy document … include[d] ERISA-specific notices referring to the statute, thus indicating the employer's intent to provide a plan subject to ERISA"); *Elliott v. Lockheed Martin Energy Sys., Inc.*, 61 F.Supp.2d 745, 753 (E.D.Tenn.1999) (finding that the employer "clearly endorsed the Plan at issue" where the employer-provided summary plan description "contain[ed] an entire page that specifically refer[red] to ERISA in explaining the employee's rights under the policy"). The weight that courts place on this factor makes particular sense when one remembers that it is from the viewpoint of a reasonable employee that the endorsement inquiry is to occur.

ORDERED AND ADJUDGED that Edwards's Motion to Remand (DE# 7) is GRANTED. This case is hereby RE-MANDED to the Circuit Court for the Fifteenth Judicial Circuit in and for Palm Beach County, Florida. The Clerk shall take all necessary steps to effectuate this remand. Further, Prudential's Motion to Dismiss (DE# 2) is DENIED AS MOOT. Finally, in its discretion, *see* 28 U.S.C. § 1447(c), the Court DECLINES to award any fees and costs associated with this removal and remand.