ALLSTATE INSURANCE
CO., Plaintiff,

Herbert RICE,

v.

Denise QUICK, and Robert
McKee, Defendants.

Robert McKee, Plaintiff,

Herbert Rice,

v.

United States of America, for Denise
Quick, Defendant.

No. C–3–98–338.

United States District Court,
S.D. Ohio,
Western Division.

Dec. 3, 2002.

Paul Roderer, Dayton, OH, for Plaintiff.

Andrew Storar, Patrick Quinn, James Greene, III, Frank Payson, Dayton, OH, for Defendants.

ENTRY SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING SCOPE OF EMPLOYMENT; OPINION; PLAINTIFF'S CAUSE OF ACTION DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION, ON THE COURT'S OWN MOTION, TO THE EXTENT IT IS DEEMED ONE AGAINST THE UNITED STATES; DENISE QUICK RE-SUBSTITUTED AS DEFENDANT TO THE EXTENT UNITED STATES IMPROPERLY SUBSTITUTED ITSELF AS DEFENDANT, AND THIS PORTION OF THE CASE REMANDED TO THE GREENE COUNTY COMMON PLEAS COURT, ON THE COURT'S OWN MOTION; TERMINATION ENTRY

RICE, Chief Judge.

This consolidated action originated with Plaintiff Robert McKee's two-count Complaint (attached to Doc. # 1) for defamation and intentional infliction of emotional distress against Denise Quick, a civilian employee at Wright Patterson Air Force Base in Dayton, Ohio ("Wright Patterson"). McKee originally filed his Complaint in the Greene County Common Pleas Court. Pursuant to 28 U.S.C. § 2679(d)(2), the United States of America substituted itself for Quick as the Defendant and removed the case to this Court. (*See* Doc. # 1.) Presently at issue is whether the United States properly substituted itself as the Defendant in this lawsuit and properly removed the case to this Court.

McKee, who formerly worked as Quick's supervisor at Wright Patterson, alleged in his Complaint that Quick defamed him on several occasions by publishing communications to his supervisors and co-workers at Wright Patterson that he had sexually harassed her and discriminated against her on the basis of her race. (Compl.¶ 6.) He claimed that she defamed him in a second manner by publishing communications to his supervisors, co-workers, and Wright Patterson security police that he had physically assaulted her. (*Id.* ¶ 7.) Pointing to the same alleged conduct, McKee pled a second count for intentional infliction of emotional distress. (*Id.* ¶¶ 12–15.) He also sought punitive damages. (*Id.* ¶¶ 16–17.) For her part, Quick requested that her insurer, Allstate Insurance Co. ("Allstate"), provide her with legal representation, in response to which Allstate filed a separate action in the Greene County Common Pleas Court for a declaratory judgment on its obligation to her. The state court thereafter consolidated the two actions. Subsequently, per the certification of the United States Attorney for the Southern District of Ohio that Quick had acted within the scope of her employment at all times relevant to McKee's Complaint, the United States filed a Notice of Substitution and Removal (Doc. # 1), substituting itself as the proper Defendant in McKee's action against Quick and removing the consolidated action to this Court. The portion of the case concerning Allstate's request for a declaratory judgment is currently under a stay of this Court.

■ There is no dispute that if the United States properly substituted itself, the action must be dismissed.[1] By the

---

1. As the Court noted in its Decision and Entry of March 15, 1999: "The remedy for an action in which the United States has been substituted for the employee is provided by the Federal Tort Claims Act and lies against the United States." *Henson v. National Aeronautics and Space Admin.*, 14 F.3d 1143, 1147 (6th Cir.1994). Tort claims brought against the United States under the Federal Tort Claims Act are subject to an administrative review procedure, and must be dismissed if this procedure has not been exhausted. *Id.* at 1148. McKee did not exhaust any administrative remedies against the United States,

same token, there is also no dispute that if the United States did not properly substitute itself, Quick must be re-substituted as the proper Defendant. *See Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). Whether the case should be remanded in that event is an issue upon which the Court will elaborate in greater detail below.

Whether the United States properly substituted itself turns on whether Quick was acting within the scope of her employment at Wright–Patterson, as the United States Attorney has certified, when she took the alleged actions which spurred McKee's tort claim in state court. *See* 28 U.S.C. § 2679(d)(2). Earlier in this litigation, the United States, consistent with its certification, averred that she was and moved to dismiss. (*See* Doc. # 2.) In response, McKee averred that she was not and moved to remand the case to the Greene County Common Pleas Court. (*See* Doc. # 8.) After considering the arguments proffered by the two parties in their respective Motions and related memoranda, the Court determined that, absent an evidentiary hearing on the matter, it could not make a ruling on the scope of employment issue, which, in this context, presents a question of law. (*See* Doc. # 23 at 6, 17–21); *Coleman v. United States,* 91 F.3d 820, 823 (6th Cir.1996). It therefore overruled both motions, stating that it would revisit the competing issues of dismissal and remand after it had conducted such a hearing. (*See* Doc. # 23 at 21.)

The Court conducted its hearing on November 12, 1999, as continued and completed on June 9, 2000. (*See* Doc. # s 39, 42, 45 & 47.) Following said hearing, the parties filed with the Court their respective post-hearing memoranda of law. (*See* Doc. # s 49, 50 & 51.) Herein, the Court shall set forth its findings of fact, opinion, and conclusions of law with respect to the scope of employment issue. For the reasons which follow, subject to the limitations discussed, the Court finds that the United States improperly substituted itself as the Defendant in this case.

## I.  *Findings of Fact* [2]

The Court finds that McKee proved the following facts by a preponderance of the testimony and evidence adduced at the evidentiary hearing:

1.  During the relevant time period, McKee was Quick's supervisor at the National Air Intelligence Center ("NAIC"), at Wright Patterson. (Doc. 42 at 6–7.)

2.  Wright Patterson maintains a workplace discrimination grievance system in conformity with Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (Doc. # 47 at 27.)

3.  Wright Patterson also employs security police who serve, at least in part, for the protection of employees who feel physically threatened by other individuals. (*Id.*)

4.  In January, 1997, Quick filed a Title VII grievance against McKee, on the basis of race and sex discrimination. (Doc. # 42 at 8–9 & 114–16.)

5.  Around the same time, Quick communicated to her mother, Jeanette Goode, that she was having problems with McKee at work due to her sex and race, even though her mother had nothing to do with

---

and acknowledged in an earlier brief to the Court that if the United States properly substituted itself, his claim will have to be dismissed for lack of subject matter jurisdiction. (*See* Doc. # 19 at 3.)

**2.**  References below will be made to the transcript of proceedings of November 12, 1999 (Doc. # 42) and those of June 9, 2000 (Doc. # 47).

the Title VII grievance system at the NAIC. (*Id.* at 18–20.)

6. Quick also stated to Catherine Thomas, a co-worker, that McKee discriminated against her because of her race, even though Thomas had nothing to do with the Title VII grievance system at the NAIC. (*Id.* at 64, 66.)

7. Other employees at the NAIC were also aware that Quick considered McKee to have discriminated against her on the basis of her race and sex. (*Id.* at 91, 93–94.)

8. On April 1, 1997, Quick filed an assault complaint against McKee with the Wright Patterson security police, relating to a confrontation between the two of them which had taken place four days earlier, on March 27. Their confrontation consisted of McKee yelling at Quick about certain workplace personnel issues. At some point, he caused a clipboard to fall off a file cabinet and come into contact with Quick, the event which triggered her assault complaint. At the time, upset and startled, Quick proceeded to engage the assistance of the security police and another supervisor. Several days later she submitted a written statement of her own making, and the next day, April 1, completed an official complaint at the insistence of Staff Sergeant Edward Opsahl, a security policeman at the NAIC. (*Id.* at 20–21, 48, 61–63, 82, 84, 86.)

9. By the time she filed the official complaint for assault, she had at least some idea that the clipboard incident might have occurred accidentally. (*Id.* at 63.)

10. When she filed her assault complaint, she also stated to the Wright Patterson security police that McKee had a problem with the fact that she, a black woman, held the employment position that she did, even though the security police had nothing to do with the Title VII grievance system. (*Id.* at 26–28, 87.)

11. Her allegation that McKee discriminated against her as a black woman bore no relation to her complaint of assault. (*Id.* at 87.)

12. Talk of Quick's assault complaint against McKee was widespread throughout the building in which they worked. (*Id.* at 66.)

13. Quick's honesty and commitment to telling the truth are in doubt. (*Id.* at 64, 73–74, 92, 98, 101–02 & 109.)

14. The filing of false security complaints at Wright Patterson is a ground for disciplinary action. (Doc. # 47 at 32.)

## II. *Opinion*

McKee's Complaint for defamation and intentional infliction of emotional distress stemmed from Quick's claims to others, outside the Wright Patterson Title VII grievance process, that he had discriminated against her, and from the assault complaint which she filed with the Wright Patterson security police and allegedly discussed with others. (*See* Doc. # 42 at 115.) The Court will first consider the proper standard for review. It will then consider whether Quick acted outside the scope of her employment when she filed her assault complaint with the Wright Patterson security police. Following that, the Court will consider whether Quick made any allegedly defamatory comments to co-workers or others not involved in the formal grievance systems established at Wright Patterson, such that it might be said she acted outside the scope of her employment when she did so. Finally, the Court will consider whether it is appropriate, under any circumstance, to remand this action to the Greene County Common Pleas Court.

### A. *Standard for Review*

At the heart of this dispute is McKee's allegation that Quick made defamatory

statements. Although the Court is not concerned herein with whether any of her statements were, in fact, defamatory, it is concerned with one element of a defamation cause of action: the act of publication.

The publication of defamatory matter is an essential element to liability for defamation. "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." 3 Restatement of the Law 2d, Torts (1965), Section 577(1). *Any* act by which the defamatory matter is communicated to a third party constitutes publication. *Id.* at Comment a. Also, it is sufficient that the defamatory matter is communicated to one person only, even though that person is enjoined to secrecy. *See id.* at Comment b. Ohio law recognizes that publication of defamation consists in communicating it to a person or persons other than the person libeled. [*Hahn v. Kotten*, 43 Ohio St.2d 237, 331 N.E.2d 713, 718 (1975) ].

*Hecht v. Levin*, 66 Ohio St.3d 458, 613 N.E.2d 585, 587 (1993) (emphasis in original). Assuming *arguendo* that Quick published defamatory statements about McKee to at least one other person, whether the United States properly substituted itself for Quick depends on whether Quick was in the scope of her employment when she did so.[3]

28 U.S.C. § 2679(d)(2) provides that the United States shall be substituted as the defendant in a civil action filed against an individual in state court, and the case removed to federal court, upon certification by the Attorney General that the named individual defendant was acting within the scope of her federal employment at the time of the incident out of which the civil action arose. In its Decision and Entry of March 15, 1999, the Court noted that the plaintiff in such a situation may raise a judicial challenge to the Attorney General's certification and the substitution of the United States. (Doc. # 23 at 6.) In other words, the plaintiff may rebut the Attorney General's certification, which is treated as *prima facie* evidence that the individual defendant was acting within the scope of her federal employment at the time of the incident giving rise to his claim, by presenting evidence that the individual defendant *was not* acting within the scope of her federal employment at that time. (*Id.*)

■ The scope of employment question, in this case, is one of Ohio law. (*Id.* at 7–8.) Under Ohio law, an employee acts within the scope of her employment if her conduct: (1) is of the kind which she is employed to perform; (2) occurs substantially within the authorized limits of time and space; and (3) is actuated, at least in part, by a purpose to serve the employer. (*See id.* at 8); *Anderson v. Toeppe*, 116 Ohio App.3d 429, 688 N.E.2d 538, 543 (1996). Furthermore, while an employee may still be regarded as within the scope of his employment even if he engages in intentionally tortious or malicious acts, (*see id.*); *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1143 (6th Cir. 1996), "[a]n employer is not liable for the independent acts of employees that in no way facilitate or promote the employer's business." *Anderson*, 688 N.E.2d at 543. In order for an employee's intentional or malicious acts to be regarded as undertaken within the scope of her employment, such acts must in some way be calculated to facilitate or promote the business for

---

**3.** Because McKee's claim for intentional infliction of emotional distress also stems from the publication of these allegedly defamatory statements, whether the United States properly substituted itself as to this claim is coextensive with the question of whether it did so as to the defamation claim.

which she is employed. (*See* Doc. # 23 at 9); *Cooper v. Grace Baptist Church*, 81 Ohio App.3d 728, 612 N.E.2d 357, 362 (1992). Stated from the opposite perspective: "When an employee diverts from the straight and narrow performance of his task, the diversion is not an abandonment of his responsibility and service to his employer unless his act is so divergent that its very character severs the relationship of employer and employee." *Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825, 829 (1992). As the Ohio Supreme Court held in *Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d 584, 588 (1991), "an intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment .... " (citing *Vrabel v. Acri*, 156 Ohio St. 467, 103 N.E.2d 564, 568 (1952)).

■ Several appellate courts in Ohio have recognized or held that where an employee makes allegedly false or defamatory statements about another employee to co-workers or superiors or others, outside the parameters of a formal grievance procedure, she does so outside the scope of her employment. *See, e.g., Trader v. People Working Cooperatively, Inc.*, 104 Ohio App.3d 690, 663 N.E.2d 335, 340 (1994); *Cooper v. Grace Baptist Church*, 81 Ohio App.3d 728, 612 N.E.2d 357, 363 (1992); *Corradi v. Emmco Corp.*, 1996 WL 65822 (Ohio Ct.App. Feb. 15, 1996); *Lamson v. Firestone Tire & Rubber Co.*, 1991 WL 35098 (Ohio Ct.App. March 13, 1991).

In *Cooper*, the Tenth District Court of Appeals reasoned that a church pastor acted outside the scope of his employment when he made disparaging remarks about a church member. Kristol Cooper, a member of the congregation, had contacted the Ohio Attorney General's office after unsuccessfully attempting to obtain copies of the church's by-laws and constitution. *Id.* at 359. The Attorney General's office conducted an investigation and spoke with the church's pastor about providing the by-laws and constitution. *Id.* at 359–360. During a telephone conversation with the state investigator, the pastor remarked that Cooper should be prosecuted for misappropriating church funds. *Id.* at 360. Cooper subsequently filed suit against the church and its minister, alleging defamation. Upon review, the Tenth District concluded that the pastor's derogatory comment fell outside the scope of his employment, reasoning:

> Certainly, it was within Calloway's scope of employment as a pastor to respond to the Attorney General's investigation relative to the production of the church's by-laws and constitution. On those matters, Calloway had authority to communicate with McClain. However, during the course of that conversation on those legal matters, it was not necessary for Calloway to inject his personal opinions as to plaintiff's alleged misconduct.
>
> At trial, plaintiff did not introduce any evidence that Calloway's gratuitous rendering of his personal evaluation of plaintiff's alleged prior conduct in any way facilitated the church's functions. During his case-in-chief, plaintiff failed to demonstrate that it was within Calloway's scope of employment, or duties as a minister, to publicly render personal opinions about members of the congregation. No evidence was offered by the plaintiff that Calloway was authorized by the church to make such statements, nor was there evidence before the trial court that the church ratified Calloway's conduct after the fact.... The alleged defamatory remarks attributed to Calloway had nothing whatsoever to do with responding to McClain's official inquiry.

*Id.* at 363.

The plaintiff in *Corradi*, Rebecca Corradi, filed her suit for defamation against her

former employer and a former co-worker, Irene Soltis, after a potential employer rescinded its offer of employment to her on the basis of false statements first published by Soltis. 1996 WL 65822, at *2. The false statements made by Soltis were that Corradi had been fired from her job as apartment complex property manager for taking money from petty cash and removing carpeting and appliances from apartments. *Id.*[4] On appeal from a jury verdict in favor of Soltis and a directed verdict in favor of Corradi's former employer, the Eighth District Court of Appeals held that because Soltis's responsibilities "did not include providing information regarding the reasons for Corradi's discharge from [her employer]," and because there was no evidence that her remarks tended to facilitate or promote the employer's business, it could not be said that she acted within the scope of her employment at the time she made the false statements. *Id.* at 3. It concluded, therefore, that the trial court properly directed a verdict in favor of Corradi's former employer, given that it could not be held vicariously liable for Soltis's statements. *Id.*

Finally, there is the *Lamson* case, which is factually similar to the case at bar. The plaintiff in that case, Perry Lamson, filed a complaint for defamation and intentional infliction of emotional distress against his former employer for statements made by a company secretary, Jacqueline Chandler, who, he alleged, had filed a false sexual harassment grievance against him. 1991 WL 35098, at *1. Importantly, he alleged that Chandler told co-workers with no connection to the formal harassment investigation process that he had harassed her. *Id.* at 3. His claim against his former employer, pursued on a *respondeat superior* theory of liability, was dismissed by the trial court on summary judgment. *Id.* The

Ninth District Court of Appeals affirmed the grant of summary judgment, holding that Lamson had not demonstrated how Chandler's statements to co-workers, though made while she was in her employer's employ, were made within the scope of her employment as a secretary. *Id.*

■ In contrast to the cases just discussed, the Sixth Circuit, construing Ohio law, has noted that the filing of a formal internal grievance is generally within the scope of an employee's employment, as it facilitates a process created by the employer specifically for such matters. *Coleman,* 91 F.3d at 824–25.

Having now made its findings of fact with regard to Quick's actions vis-a-vis McKee, the Court may assess whether, under Ohio law, any such actions fell outside the scope of her employment.

B. *Whether Quick Acted Outside the Scope of Her Employment*

The Court will first consider whether Quick acted outside the scope of her employment when she filed her assault complaint against McKee on April 1, 1997, four days after the alleged assault took place. McKee argues that Quick had no reasonable basis for filing the assault complaint, and that in doing so, she acted with an intentionally tortious or malicious purpose. In support of this argument, he points to the testimony of Cathy Thomas that Quick was aware, by the time she actually filed the official complaint on April 1st, that McKee's action which caused the clipboard to come off the filing cabinet and make contact with her was an accident. (Doc. # 50 at 4; *see also* Doc. # 42 at 63.) He also points to the testimony that Quick had a questionable reputation for truth and

---

4. The claims against Soltis were submitted to the jury, which found her statements about

Corradi to be false, but not otherwise defamatory.

honesty. (Doc. # 50 at 4; Doc. # 42 at 64, 73–74, 92, 98, 101–02 & 109.)

██ There is no question that the Wright Patterson security police serve in some measure to protect the safety of Wright Patterson employees and that an employee who feels threatened should be encouraged to turn to them for such protection and to file a formal complaint with them if necessary. As the Court noted in its Decision and Entry of March 15, 1999, the filing of an internal grievance is generally within the scope of an employee's employment, as it facilitates a process created by the employer specifically for such matters. (Doc. # 23 at 11); *Coleman,* 91 F.3d at 824–25.

However, it might be asked whether Quick abused the grievance process made available to her by her employer, *and,* if so, whether that fact changes the character of her action, from one arising within the scope of her employment, to one arising outside of it. In other words, it might be argued, as McKee does, that although Quick utilized a formal internal grievance system when she published her assault complaint, she did so in a malicious manner that in no way promoted or facilitated her job or the purpose for which the grievance system was established.

██ In this case, the testimony presented at the evidentiary hearing demonstrated that it would be typical for an employee to file a complaint with the Wright Patterson security police if she felt she had been threatened by a co-worker. Nevertheless, given the testimony that Quick had reason to think, before she had filed her official complaint, that the underlying incident was likely an accident (Doc. # 42 at 63), the Court can appreciate McKee's argument that her motives in pursuing the assault complaint appear questionable. However, it does not believe that her act of filing the assault complaint in no way promoted or facilitated the business for which

she was employed. While some of the testimony elicited at the hearing from Cathy Thomas adds credence to McKee's position that Quick had no reasonable basis for filing her assault complaint, the Court does not find that he demonstrated this fact by a preponderance of the evidence. It should not be discounted that Thomas also testified that at the time of their confrontation, McKee was "enraged" and yelling at Quick, and that Quick was noticeably upset and "probably startled." (*Id.* at 61–63.) Furthermore, while it is clear that Thomas, who witnessed the confrontation, expressed her opinion to Quick that the clipboard incident was an accident, her testimony was not clear as to whether Quick herself ever acknowledged this fact. (*Id.*) Given that Quick first approached the security police for assistance in dealing with McKee on the date of the confrontation, when she had abundant reason to be upset from the verbal hostility he showed her, and the equivocal testimony that she came to realize in the days that followed that the actual physical altercation stemming from the clipboard incident was an accident, the Court cannot say that her filing of the official assault complaint on April 1, 1997, was "so divergent [from her duties] that its very character severs the relationship of employer and employee."

Accordingly, the Court finds that the evidence supports the United States Attorney's certification that Quick was acting within the scope of her employment when she filed the assault complaint against McKee. This is only so, however, to the extent she used the mechanism provided by her employer for the purpose it was intended, i.e., to file a complaint within the bailiwick of the security police. To the extent she did so, the United States properly substituted itself as the Defendant. To the extent she did not use that process for its intended purpose, the factual nature of which the Court will discuss next, the

United States did not properly substitute itself as the Defendant.

In issuing its Decision and Entry of March 15, 1999, the Court stated that if it were shown that Quick had made allegedly defamatory statements about McKee to co-workers who were not involved in the processing or investigation of her respective internal complaints, then, under the law of Ohio, as illustrated by the holdings in *Trader, Cooper, Corradi,* and *Lamson,* discussed *supra,* such remarks "likely would exceed the scope of her federal employment." (Doc. # 23.) The Court now finds, based on the testimony provided at the evidentiary hearing, that Quick published certain statements regarding her Title VII grievance against McKee outside of the official channels established for such grievances at Wright Patterson, such that it can be said she did so outside the scope of her employment, but that she did not do so with respect to the assault complaint. With regard to the latter complaint, aside from Cathy Thomas, there is no evidence that Quick stated to any other co-worker that McKee assaulted her. Furthermore, while there was testimony that Quick stated as much to Thomas (Doc. # 42 at 62–63), she, as a witness, was capable of coming to her own conclusions as to the truth of the assertion. Although Thomas testified that word of Quick's assault complaint against McKee circulated throughout the NAIC (Doc. # 42 at 66), the Court does not find that the testimony and evidence in the record are substantial enough to support, by a preponderance of the evidence, the inference that Quick was the direct source of everybody's knowledge of this information.

▇▇▇ On the other hand, as it relates to her publication of her Title VII grievance, certain statements which Quick made to Thomas, Jeanette Goode (her mother), and Sgt. Opsahl, concerning McKee's attitude toward her race and sex, *were* made out-side the scope of her employment. Thomas testified at the hearing that Quick had told her that McKee had discriminated against her because of her race. (Doc. # 42 at 64.) The United States contends that this comment was made immediately following the incident which sparked Quick's assault complaint, when she "was upset and probably startled" from McKee's conduct. (Doc. # 51 at 3.) According to the United States, Quick made this statement to Thomas, in her startled state, as a means of offering one possible explanation of why McKee assaulted her. (*Id.; see also* Doc. # 42 at 132.) The Court disagrees with the United States' characterization of Thomas's testimony. While Thomas did testify that Quick was "upset and probably startled" after her confrontation with McKee, on March 27, 1997, the Court did not understand Thomas's testimony that Quick had told her that McKee had discriminated against her on the basis of race to be related to the incident giving rise to the assault. All Thomas stated upon being questioned "when" Quick made this statement is that it was "probably after [the alleged assault] incident happened." (Doc. # 42 at 64.) By "after," the Court understood Thomas to be speaking of a point in time following an appreciable lapse of time from the date of the alleged assault, not the moment immediately following same. Indeed, the · questioning by McKee's counsel had by that point already progressed past the facts surrounding the alleged assault, and what of that event Thomas had witnessed, into a more general line of questions about what knowledge Thomas had of McKee's demeanor toward Quick throughout the duration of their supervisor/employee relationship.

With respect to Sgt. Opsahl, the statement by Quick which was made outside the scope of her employment was that in which she accused McKee of having a problem with her as a black woman. (*Id.* at 26–28,

87.) The Court has already noted its belief that to the extent Quick used a formal grievance system for the purpose of filing her complaint of assault with the security police, she did so within the scope of her employment. It is another matter, however, that she used that opportunity to make a remark which was completely irrelevant to her complaint for assault. Far from having the ability to investigate, and thus dispel, the truth of whether McKee had displayed discriminatory tendencies toward Quick, the security police had no authority to act on such a claim. (*See* Doc. # 47 at 37.) It was none of their business, and in that regard, Quick's statement to Sgt. Opsahl that McKee had a problem with her as a black woman was qualitatively no different than had she made the identical statement to any other co-worker or individual not involved in the Title VII claim review process.

*Cooper*, discussed *supra*, is illustrative of this particular point. Although there was no harm in the church pastor answering questions relevant to the Ohio Attorney General's investigation of the parishioner's complaint, his statement that she should be prosecuted for misappropriating church funds was, as the Tenth District Court of Appeals concluded, irrelevant and derogatory, and not made in the scope of his employment, given that he could not demonstrate that his "gratuitous rendering of his personal evaluation of the plaintiff's prior conduct in any way facilitated the church's functions." 612 N.E.2d at 363. This Court finds that the same sentiment can be applied to Quick's gratuitous rendering of her discrimination grievance against McKee to Sgt. Opsahl.

Though it does not raise the argument in its post-hearing memoranda, counsel for the United States insinuated in a line of questions at the evidentiary hearing that a report of discriminatory tendencies might help shed some light on an assault complaint. (Doc. # 47 at 36–37.) Yet, whatever merit there might be to such, there was no testimony or evidence adduced at the evidentiary hearing suggesting that Quick made such a statement for purposes of providing context to her assault complaint. Nothing in the record demonstrates a relevant nexus between the confrontation which spurred Quick's assault complaint and her statement to the security police that McKee had a problem with her as a black woman. From everything in the record, the report to the Wright Patterson security police that McKee harbored such feelings appears completely gratuitous and irrelevant. Even Sgt. Opsahl, who took the assault complaint from Quick several days after the March 27, 1997, confrontation, stated that her comments regarding McKee's alleged problem with her race and sex were unrelated to such. (Doc. # 42 at 87.)

Finally, the Court finds that Quick made certain statements to Goode, her mother, about McKee's personal feelings about her race and sex. Though the full extent of what she discussed with her mother is as of yet inconclusive, the Court is satisfied, based on her testimony as elicited by counsel for McKee, as well as her questionable veracity, that McKee demonstrated, by a preponderance of the evidence, that Quick published allegedly defamatory comments to her mother about him, outside the scope of her employment. As an additional point, while it is true that McKee stated at the hearing that the allegations in his complaint were based only on statements which Quick allegedly made to Cathy Thomas, Michelle Scott and Sgt. Opsahl (*id.* at 120),[5] this point is irrelevant for the

---

**5.** With respect to Michelle Scott, the Court agrees with the United States that McKee failed to prove, by a preponderance of the evidence, that Quick made any potentially defamatory statements to her.

time being. The Court is not entertaining the question of what facts are within the scope of the pleadings. It is enough to note that because McKee has shown that Quick did indeed make statements to Thomas, Sgt. Opsahl and her mother outside the scope of her employment, the United States wrongly substituted itself for Quick in that regard. The extent to which Quick's statements to her mother are relevant to McKee's cause of action can be raised at another time.

There is no basis for invoking, as the United States does, Section 9.86 of the Ohio Revised Code, which states:

> Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

*First,* Quick is not an officer or employee of the State of Ohio. For purposes of determining whether she was in the scope of her employment at all relevant times, the Court treats her as if she were in the employ of a private business in Ohio. *Second,* even if applicable, the statute would present a redundant test, as the Court is already obligated to determine whether she acted within the scope of her employment, and it has determined that she did not, at least not at all times.

It should be stressed that the Court makes no findings on whether any of the statements made by Quick outside the scope of her employment were defamatory, or, even if so, whether any were privileged under the common law of Ohio. The Court points this out because the United States argues to the effect that Quick's conversations with her mother were perfectly normal and harmless. (Doc. # 51 at 4–5; *see also* Doc. # 47 at 28.) They may have been, but that is not the issue at present. The only issue is whether they were made within the scope of her employment. It may be normal and even expected that an individual will discuss such topics with friends, family members, and even close co-workers or former occupants of one's position. However, that such discussions may be "normal" does not bring them within the scope of employment; it is merely an issue to raise in one's defense against the claim of liability or for purposes of challenging damages. In addressing the scope of employment issue, the Court must assume that the statements Quick made to Thomas, Sgt. Opsahl and Goode were defamatory. Consistent with this, the inquiry must remain focused on the time and place of her statements, and whether they were in fact made, not their perceived gravity. Because so many of the Ohio cases dealing with this issue arise in the *respondeat superior* context, one way to address the issue herein is to ask whether Wright Patterson, if it were a private employer, could be held vicariously liable for the statements Quick made to Thomas, Goode, and Sgt. Opsahl, concerning McKee's race and sex-based remarks, assuming *arguendo* that they were defamatory. In light of the holdings rendered in *Trader, Cooper, Corradi,* and *Lamson,* discussed *supra,* the answer is that it could not. It follows, then, that Quick's statements cannot be said to have been made to promote or facilitate the business for which she was employed.

It is also irrelevant for the time being whether Goode republished anything her daughter may have told her about McKee, or whether Quick's statements to her can rationally be viewed as part of a "vendetta" against McKee. (*See* Doc. # 51 at 5.) Again, the merits of McKee's civil action

are not now the Court's concern. As noted, defamation requires but a single publication to an individual other than the subject of the published statement, and Quick's publication to Goode fits the bill in this respect.

In sum, to the extent the United States substituted itself as the defendant, it did so improperly, insofar as McKee's Complaint against Quick, for defamation and intentional infliction of emotional distress, is premised on her statements made to Thomas, Sgt. Opsahl and Goode. With respect to these three individuals, because none of them was involved in the Title VII claims process at Wright Patterson, and because Quick nevertheless made statements to all of them about McKee's alleged negative treatment of her because of her race and/or sex, the Court hereby finds that the United States Attorney for the Southern District of Ohio erred when it certified that Quick was acting within the scope of her employment, as governed by Ohio law, when she made such statements. To the extent the Court has found that Quick acted outside the scope of her employment, she is hereby re-substituted for the United States as the Defendant in this case.

On the other hand, to the extent the Court has found that Quick acted in the scope of her employment when she made certain other statements which form the basis for McKee's Complaint, *viz.*, when she filed her assault complaint, *for assault*, with the Wright Patterson security police, or when she made any statement other than those made to Thomas, Sgt. Opsahl and Goode, noted above, the Court finds that the United States properly substituted itself for Quick. To this extent, McKee's claims for defamation and intentional infliction of emotional distress are hereby dismissed upon the Court's own motion, for lack of subject matter jurisdiction, because, as McKee has acknowledged, he did not exhaust his administrative remedies against the United States pursuant to the Federal Tort Claims Act. (*See supra* note 1; Doc. # 19 at 3.)

C. *Whether Remand is Appropriate*

■ The final issue concerns the appropriateness of remand of McKee's action for defamation and intentional infliction of emotional distress against Quick, to the extent she has been re-substituted as the Defendant. For reasons not raised in McKee's own Motion to Remand (Doc. # 8), the Court finds that it must, upon its own motion, remand the case to the Greene County Common Pleas Court.

The text of 28 U.S.C. § 2679(d) reads as follows:

(1) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

(2) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding *shall be deemed to be an action or proceeding brought against the United States* under the provisions of this title and all references thereto, and the Unit-

ed States shall be substituted as the party defendant. *This certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal.*

(3) In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment. Upon such certification by the court, such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. A copy of the petition shall be served upon the United States in accordance with the provisions of Rule 4(d)(4) of the Federal Rules of Civil Procedure. In the event the petition is filed in a civil action or proceeding pending in a State court, the action or proceeding may be removed without bond by the Attorney General to the district court of the United States for the district and division embracing the place in which it is pending. *If, in considering the petition, the district court determines that the employee was not acting within the scope of his office or employment, the action or proceeding shall be remanded to the State court.*

(Emphasis added.)

The finding that the United States improperly substituted itself as the Defen-

dant to the part of McKee's action for defamation and intentional infliction of emotional distress which arises from Quick's allegedly defamatory statements to Thomas, Jeanette Goode, and Sgt. Opsahl, raises a substantial question concerning subject matter jurisdiction that has not been addressed by the Sixth Circuit Court of Appeals, but on which there is a difference of opinion in several other federal courts of appeals. The question in dispute is three-fold: (1) whether the remand question is governed by 28 U.S.C. § 1447,[6] or, rather, § 2679(d)(2); (2) whether § 2679(d)(2) allows the Court, by its literal terms, to remand an action previously removed by the United States; and, *if not,* (3) whether retaining jurisdiction of the action pursuant to § 2679(d)(2) would exceed the constitutional bounds of the Court's subject matter jurisdiction, such that the action would have to be remanded and the statute declared unconstitutional on that basis?

In 1995, the Supreme Court rendered an important but inconclusive decision touching on the question raised above. In *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995), the Supreme Court held that nothing in the language of § 2679(d)(2) barred a federal district court from reviewing the Attorney General's certification that the individual defendant named in a state court tort action was, in fact, acting within the scope of his federal employment, for purposes of determining whether the United States properly substituted itself as the

---

**6.** Generally speaking, 28 U.S.C. § 1441(a) allows a defendant sued in state court to remove the action to federal court if the federal court would have had original jurisdiction under 28 U.S.C. §§ 1331 or 1332. Section 1447(c), in turn, allows the plaintiff to move the federal court to which the case was removed to remand the case to the state court, within 30 days from the filing of the notice of

removal, if the process of removal was procedurally defective. The federal court is obligated to remand the case at any time if it becomes apparent that it lacks subject matter jurisdiction over the case. Section 1447(d), in most cases, bars appeal of a remand order. *See Thermtron Prods., Inc. v. Hermansdorfer,* 423 U.S. 336, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976).

defendant. In so holding, it noted that Congress made the certification of the Attorney General conclusive "for purposes of removal," not for purposes of substitution. 515 U.S. at 432, 115 S.Ct. 2227. It also held that Congress' intent in stating, in § 2679(d)(2), that the post-substitution action "*shall* be deemed to be an action or proceeding brought against the United States" (emphasis added) was not to preclude judicial review of the substitution, opining that such a reading would render the Attorney General the arbiter of whether a civil action against a federal employee could go forward, and reduce the role of the federal courts in such cases to "rubber-stamp work." *Id.* at 423–34., 115 S.Ct. 2227 On this point, it added that were the "shall be deemed" language to be interpreted as dispositive on the question of whether the United States properly substituted itself, Congress would have had no reason to state in the next sentence that the Attorney General's certification was conclusive for purposes of removal, for the insulation from remand would already be apparent. *Id.* at 432 & n. 8, 115 S.Ct. 2227.

Thus, the *Lamagno* Court held that a district court may order the re-substitution of the original individual defendant where it is found that he was not acting within the scope of his employment at the time of the events giving rise to the tort action against him. *Id.* at 434, 115 S.Ct. 2227.

Unlike the case at bar, *Lamagno* was originally filed in federal court as a diversity action, *see* 28 U.S.C. § 1332, and, therefore, the United States invoked § 2679(d)(1) in substituting itself for the individual defendant, not (d)(2). As such, the dual questions of removal and remand were not presented for adjudication. The matter did not go unobserved, however. Indeed, it was raised by *amicus curiae* that if, in the context of a removal action, the statute were to be read as allowing the

originally named, non-diverse individual to be re-substituted for the United States upon a finding that he acted outside the scope of his employment, while precluding remand due to fact that the Attorney General's certification was conclusive "for purposes of removal," then a serious Article III question would present itself, to wit: whether Congress vested in the district court the duty to retain a case or controversy outside the purview of the subject matter jurisdiction granted to it by the Constitution. *Id.* at 434–35, 115 S.Ct. 2227. A four-justice plurality disagreed with the premise, stating that the scope of employment question was itself a significant federal question justifying the continuing exercise of jurisdiction even if it were found that the United States had improperly substituted itself. *Id.* at 435, 115 S.Ct. 2227 (Ginsburg, J., plurality). The plurality also stated that principles of judicial economy justified the district court's retention of the case, *id.* at 436, 115 S.Ct. 2227, and that the retention of jurisdiction, even if arguably at "the limit" of Article III jurisdiction, was "less ominous" than the alternative, which it characterized as a holding that the Attorney General's certification be deemed conclusive both for purposes of removal and substitution. *Id.*

Justice O'Connor, writing for herself with regard to the issue of remand, recognized the significance of the Article III question posed by the Court's holding, and the canon that statutes should normally be read narrowly to avoid constitutional doubts (*see, e.g., United States v. X–Citement Video, Inc.*, 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994)), but argued that because the issue of remand was not squarely before the Court, it was unnecessary to address. *Id.* at 437, 115 S.Ct. 2227 (O'Connor, J., concurring in part). Finally, a four-justice dissent criticized both the holding of the majority and the opinion of the plurality. In the dissent's opinion, by

"shall," Congress intended that § 2679(d)(2) not be interpreted in any other way than for the rule that once the Attorney General certifies that an individual defendant who has been sued in state court under a tort theory of liability had acted within the scope of her employment, the substitution of the United States becomes non-reviewable. *Id.* at 439–40, 444–49, 115 S.Ct. 2227 (Souter, J., dissenting). It also took great exception to the notion, implied by the majority and reinforced by the plurality, that a district court could retain subject matter jurisdiction of a removed case involving a non-diverse defendant after it had determined that the United States is not a proper party. *Id.* at 441–44, 115 S.Ct. 2227.

As the principal opinion concedes, then, *ante,* at 2236, its reading supposes that Congress intended federal courts to retain jurisdiction over state-law tort claims between nondiverse parties even after determining that the Attorney General's certification (and thus the United States's presence as the defendant) was improper. But there is a serious problem, on the Court's reasoning, in requiring a federal district court, after rejecting the Attorney General's certification, to retain jurisdiction over a claim that does not implicate federal law in any way. Although we have declined recent invitations to define the outermost limit of federal-court jurisdiction authorized by the "Arising Under" Clause of Article III of the Constitution, *see Mesa v. California,* [489 U.S. 121, 136–137, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) ]; *Verlinden B.V. v. Central Bank of Nigeria,* [461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ], on the Court's reading this statute must at the very least approach the limit, if it does not cross the line. This, then, is just the case for adhering to the Court's practice of declining to construe a statute as

testing this limit when presented with a sound alternative.

*Id.* at 441, 115 S.Ct. 2227 (footnote omitted). In the dissent's opinion, the plurality's opinion that the scope of employment question was itself enough to justify continuing jurisdiction, even after a determination has been made that the individual employee had not been acting in her scope of employment, "obliterates the distinction between the authority to determine jurisdiction [in the first instance] and the jurisdiction that is the subject matter of the challenge." *Id.* at 442, 115 S.Ct. 2227.

As the competing decisions in *Lamagno* demonstrate, while the four justices in the plurality suggested that there would likely be no constitutional problem with a district court retaining jurisdiction after the re-substitution of the individual employee, and while the four justices in the dissent suggested there would be, in neither opinion was it suggested that such a case should be remanded. In the dissent's view, the answer was not to address the potential Article III quagmire by remanding such a case, but to avoid the Article III question altogether by acknowledging that Congress had intended for the Attorney General's certification to stand from the outset as determinative of the question of whether the United States had properly substituted itself.

The question left open by the Supreme Court in *Lamagno,* i.e., whether remand is permissible in a § 2679(d)(2) removal case, has not gone without attention from several of the circuit courts in both pre- and post-*Lamagno* decisions.

In *Nasuti v. Scannell,* 906 F.2d 802, 809 (1st Cir.1990), the First Circuit Court of Appeals held that the Westfall Act, 28 U.S.C. §§ 2671–2680, enacted in 1988, displaced the general provisions governing the procedure for removal and remand, 28 U.S.C. §§ 1441–1452, where the underly-

ing civil action was one in tort against a federal employee. In other words, it held that § 2679(d)(2) governed the procedure for the removal and remand of tort actions against federal employees, not §§ 1441 and 1447. However, citing for authority the Sixth Circuit's then recent holding in *Arbour v. Jenkins*, 903 F.2d 416, 421 (6th Cir.1990), and presaging the Supreme Court's subsequent holding in *Lamagno*, it held that the language in § 2679(d)(2) stating that the "certification of the Attorney General shall conclusively establish scope of office *or employment for purposes of* removal" did not mean that a district court could not consider whether the United States properly substituted itself. Because the district court had remanded the case to the state court from whence it came without having first conducted a scope of employment inquiry, the First Circuit remanded the case to the district court for just that purpose. Importantly, in so doing, while holding that the procedure for remand set forth in § 1447 was irrelevant, it nonetheless instructed the district court to remand the case in the event it found that the employee named in the civil action in state court had acted outside the scope of his employment, relying upon the authority to do so "implied" in § 2679(d)(2). 906 F.2d at 814 & n. 17.

In so holding, the First Circuit disagreed with the Fifth Circuit, which had held in an earlier case that once substituted under the Westfall Act, the United States could not be replaced as the defendant by the re-substitution of the original individual defendant. *See Mitchell v. Carlson*, 896 F.2d 128, 132–36 (5th Cir. 1990). In *Mitchell*, the Fifth Circuit, citing § 1447(d), which usually bars appeal of a remand order, held that it could not review the district court's order of remand

which it had issued after it had determined that the United States had improperly substituted itself as the defendant pursuant to § 2679(d)(2). *Id.* at 131. Nonetheless, it then held that § 1447(d) *did not* bar it from considering whether the district court had properly re-substituted the individual defendant, framing the issue not as whether § 2679(d)(2) displaced § 1447(c) for purposes of remand procedure, but whether the Westfall Act barred the re-substitution of the original individual defendant in the first instance. *Id.* at 133–36. *Accord Aviles v. Lutz*, 887 F.2d 1046, 1048–50 (10th Cir.1989). It then held that the Westfall Act did bar re-substitution, effectively negating the § 1447 order of remand. Of course, this latter portion of its holding is no longer good law after *Lamagno*,[7] but *Lamagno* left it unclear how relevant § 1447 is on the question of remand in this context.

As the Fifth Circuit had in *Mitchell*, the Third Circuit held in *Aliota v. Graham*, 984 F.2d 1350, 1353 (3rd Cir.1993), that § 1447(d) did not prevent it from taking jurisdiction of an appeal on the question of whether the district court had properly ordered the re-substitution of the original individual defendant for the United States, which had previously substituted itself and removed the state court tort action to federal court pursuant to § 2679(d)(2). More importantly, however, the court went on to hold that its consideration of the district court's remand order was not barred by § 1447(d), because § 2679(d)(2) expressed in clear terms that the Attorney General's scope of employment certification was to be conclusive for purposes of removal. 984 F.2d at 1355–56. In so holding, it pointed out the difference between the language used in § 2679(d)(2) and that used

---

**7.** The Fifth Circuit acknowledged as much in *Garcia v. United States*, 88 F.3d 318, 323 (5th Cir.1996).

in § 2679(d)(3). Paragraph (d)(3), unlike (d)(2), specifically provides for remand "[i]f, in considering the petition, the district court determines that the employee was not acting within the scope of his office or employment." The *Aliota* court held that because language granting the district court the authority to remand an action exists in paragraph (d)(3), but not paragraph (d)(2), no remand is authorized where a case has been removed pursuant to paragraph (d)(2). 984 F.2d at 1356.

In the first significant post-*Lamagno* appellate decision concerning the question of remand, the District of Columbia Circuit held that nothing in § 2679(d)(2), even the language stating that Attorney General's certification was conclusive "for purposes of removal," prevented a district court from remanding an action to state court if it were found that the United States improperly substituted itself. *Haddon v. United States*, 68 F.3d 1420, 1426–27 (D.C.Cir.1995). It agreed with the First Circuit's opinion in *Nasuti, supra*, that the authority to remand does not rest with the general remand statute (§ 1447), but can be inferred, rather, by the language of § 2679(d)(2) itself, when read in conjunction with § 2679(d)(3). *Id.* at 1426–27 (citing *Nasuti*, 906 F.2d at 814 & n. 17; *Lamagno*, 515 U.S. at 430–31, 115 S.Ct. 2227 (stating that the three paragraphs within § 2679(d) "work together")). In his dissent, Judge Sentelle, borrowing elements from the Third Circuit's holding in *Aliota* and the plurality opinion in *Lamagno*, stated that he would rule that once removed to the federal court to address the scope of employment question, the case should remain in federal court, regardless of whether the individual employee is re-substituted as the defendant. *Id.* at 1428 (Sentelle, J., dissenting).

In subsequent cases, the Fourth and Fifth Circuits have disagreed with the District of Columbia Circuit, holding that once removed under § 2679(d)(2), an action cannot be remanded, regardless of the outcome of the scope of employment issue. *Borneman v. United States*, 213 F.3d 819, 829 (4th Cir.2000) (holding that § 2679(d)(2), not § 1447(d), controls the remand question); *Garcia v. United States*, 88 F.3d 318, 325–26 (5th Cir.1996) (agreeing with the *Lamagno* plurality opinion that retention of jurisdiction after re-substitution would not exceed Article III's jurisdictional perimeter); *see also Clamor v. United States*, 240 F.3d 1215, 1221 (9th Cir.2001) (Tallman, J., dissenting) (same); *cf. Garcia, supra*, at 327–336 (Garza, J., specially concurring) (agreeing in all respects with the rationale of the *Lamagno* dissent).

In the case at bar, the United States invoked 28 U.S.C. § 1441 when it removed the case to this Court. (*See* Doc. # 1 at unnumbered page 2.) In light of the foregoing discussion, there is some question whether § 1441, the general removal statute, is coextensive with the removal authority of § 2679(d)(2) or superceded by it in this context, or whether § 2679(d)(2) should be read as merely directing the Attorney General to invoke § 1441[8] in removing the case. For his part, McKee did not invoke a specific statute in moving for remand (*see* Doc. # 8), but it is plain that he did not contemplate the issue noted herein. Having reviewed the cases cited above, the Court must seriously question whether it has the authority to remand this case as it would normally under § 1447(c), given the language in § 2679(d)(2). On the other hand, it must also seriously question whether the re-

8. Actually, if anything, § 1442 is more applicable for the United States' removal purposes than § 1441, given that § 1442(a)(1) applies specifically to civil actions filed against the United States in state court.

quirement that it retain jurisdiction violates Article III, if that is how § 2679(d)(2) is to be read. As every court which has addressed this matter has noted, these are difficult questions. They are, nonetheless, questions which must be addressed.

Importantly, in *Lamagno*, the argument put forward by those contending that judicial review of the Attorney General's scope of employment certification was impermissible invoked only the language *in § 2679(d)(1)* stating that such an action "shall be deemed to be an action or proceeding brought against the United States." 515 U.S. at 432, 115 S.Ct. 2227. They *did not* direct the Court's attention to the provision *in § 2679(d)(2)* stating that the Attorney General's certification "shall conclusively establish scope of office or employment for purposes of removal," *id.*, and it was therefore unnecessary for the Court to interpret the precise meaning of that provision. True, the Court stated that such language, related as it is to the concept of removal but not substitution, helped illustrate that Congress' intent was not to foreclose judicial review of whether substitution was proper. However, because its essential holding was based on its interpretation of "shall" as used in the "shall be deemed" clause in § 2679(d)(1), and because the case before the Court *was not a removal case* and in no manner required particular scrutiny of § 2679(d)(2), its comments with respect to § 2679(d)(2) were dicta.

As noted, four justices in *Lamagno* went on to express, albeit in dicta, that it would probably not be an affront to Article III for a district to retain jurisdiction of a case such as this after determining that (1) the named employee was acting outside the scope of his employment, (2) the United States improperly substituted itself, and (3) the case is, after all, one solely between private individuals. *Lamagno*, 515 U.S. at 434–37, 115 S.Ct. 2227 (Ginsburg, J., plu-

rality). However, five of the justices expressed rather sharp reservations about the constitutionality of such a notion, *id.* at 437–38, 115 S.Ct. 2227 (O'Connor, J., concurring in part); *id.* at 438–449, 115 S.Ct. 2227 (Souter, J., dissenting), and four of them went so far as to say the plurality's approach "must at the very least approach the limit [of Article III jurisdiction], if it does not cross the line." *Id.* at 441, 115 S.Ct. 2227 (Souter, J., dissenting).

The case at bar is *the case* that sits on all fours with the hypothetical situation which the *Lamagno* plurality and dissent addressed in dicta. Assuming the holding of that case would not be reconsidered or even overruled were this case, or a case just like it, to reach the Supreme Court, the question is how a majority of that Court would come down on the question of remand. Though the conclusion is not lightheartedly reached, the Court finds, and believes that a majority of the Supreme would find, that the interpretation of § 2679(d)(2) which is most consistent with both Congress' intent in passing the Westfall Act *and* the Supreme Court's holding in *Lamagno*, is that the statute does not bar remand.

To begin with, the Court finds persuasive the view of the four-justice dissent in *Lamagno* that the initial scope of employment question, taken by itself, presents nothing more than a garden variety threshold question of subject matter jurisdiction, and that the jurisdiction to decide jurisdiction is not generally enough to justify retention of jurisdiction over the merits after it is determined that the basis for the Court's subject matter jurisdiction does not exist. *See Lamagno*, 515 U.S. at 442, 115 S.Ct. 2227 (Souter, J., dissenting). Moreover, it respectfully disagrees with the proposition put forward by the *Lamagno* plurality, and the Fifth Circuit in *Garcia*, that issues of judicial economy and

fairness to the litigants make it any more proper to ignore the serious Article III question raised in retaining jurisdiction over a case that lacks an existing federal question. *See id.* at 436, 115 S.Ct. 2227 (Ginsburg, J., plurality); 88 F.3d at 325 (citing *Lamagno* plurality opinion). Many removed cases require significant investments of time and energy in federal court to resolve questions of subject matter jurisdiction, but which, in the end, result in their remand to the state courts from whence they came. For example, where a defendant insurance company removes a claim for benefits on the basis that the claim falls under the Employee Retirement and Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), and the plaintiff objects on the grounds that the benefits plan is not governed by ERISA, it is not uncommon for a district court to conduct an evidentiary hearing, sometimes lengthy, on that question to resolve genuine issues in dispute. If it turns out that the plaintiff is correct, the case must be remanded. *See, e.g., Edwards v. Prudential Ins. Co. of Am.,* 213 F.Supp.2d 1376 (S.D.Fla.2002); *Raskin v. CyNet, Inc.,* 131 F.Supp.2d 906 (S.D.Tex.2001). It can hardly be maintained that the resolution of a scope of employment question imposes an inherently greater use of judicial time and resources than the resolution of an ERISA question, or that the former poses any greater federal question. Additionally, with regard to fairness, the Court finds that this factor, if relevant in any regard, will, in the run of cases, favor remand, given that the state forum is the one which the plaintiff chose in the first instance, and is the one more suited for handling purely state law issues.

On the other hand, the Court also respectfully disagrees with the First and District of Columbia Circuits insofar as they regard the general remand statute, § 1447, completely irrelevant, and the issue governed exclusively by § 2679(d)(2).

Those courts have both held that the authority to remand is implied in § 2679(d)(2). *See Haddon,* 68 F.3d at 1427; *Nasuti,* 906 F.2d at 814 & n. 17. In the view of the District of Columbia Circuit, the provision in § 2679(d)(3) which expressly allows a federal district court to remand a case must be read into paragraph (d)(2) in light of the *Lamagno* Court's statement that the three paragraphs of § 2679(d) must be read to "work together." 68 F.3d at 1427. On this point, the Court disagrees with the District of Columbia's interpretation, and finds the Third Circuit's rationale in *Aliota* more persuasive: because language granting the district court the authority to remand an action exists in paragraph (d)(3), but not paragraph (d)(2), no remand is *authorized,* expressly or implicitly, by paragraph (d)(2). 984 F.2d at 1356. However, this Court does not agree with the Third Circuit (or the Fourth and Fifth Circuits) that remand is, by implication, *barred* by paragraph (d)(2).

It is the opinion of this Court that remand is authorized by the general remand statute, § 1447(c), which states, in part: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." The District of Columbia Circuit, in *Haddon,* stated that "[s]ince the Westfall Act deals specifically with lawsuits brought against federal employees ... we have no need to rely upon the general remand statute to resolve this issue." This Court respectfully disagrees. As the Court will explain, although § 2679(d)(2) and (d)(3) both refer to removal, and (d)(3) even to remand, there is nothing about them that negates the applicability of § 1441, § 1442 and § 1447, the general removal and remand provisions. Because paragraph (d)(2) does not expressly bar remand, and because there is no rational reason to think that Congress

intended for cases to remain in federal court after the district court re-substitutes the individual employee upon determining that the United States improperly substituted itself, the better interpretation of § 2679(d) is that it works in harmony with, not to the exclusion of, the general removal and remand provisions.

The Westfall Act was enacted in response to the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), in which the Court held that in order for a federal employee to invoke sovereign immunity from suit, he would have to show that (1) he was acting within the scope of his employment, and (2) was performing a discretionary function. 484 U.S. at 299, 108 S.Ct. 580; H.R. Rep. 100–700, at 2–4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5946–47. Congress responded quickly (by passing the Westfall Act) in order to return federal employees to their pre-*Westfall* status, to wit: to make them immune for personal liability for all actions taken within the scope of their employment. H.R. Rep. 100–700, at 2, 4, *reprinted in* 1988 U.S.C.C.A.N. at 5946, 5947; *Lamagno*, 515 U.S. at 426, 115 S.Ct. 2227. It rejected the Supreme Court's requirement that an employee show he was engaged in a discretionary function. *Lamagno*, 515 U.S. at 426, 115 S.Ct. 2227. Notably, Congress did not state anywhere in the Westfall Act, or in its legislative history, that it intended federal employees to enjoy immunity from liability for any action committed while they were at work (i.e., "on the clock") by sheer virtue of being "federal" employees, only from liability for actions taken within the scope of their employment. It stated in the legislative history that this determination would turn on the "law of the state in which the negligent or wrongful conduct occurred," and expressly noted that "egregious" misconduct, not part of or in furtherance of one's federal employment, was not con-

templated by the Act. H.R. Rep. 100–700, at 5, *reprinted in* 1988 U.S.C.C.A.N. at 5949.

The Court finds the legislative history of the Westfall Act, invoked by every court which has discussed this issue for purposes of providing context, important in this respect: it demonstrates a clear and decisive intent on the part of Congress to provide federal employees with immunity from suit *for negligent acts taken within the scope of employment;* but beyond that, "the United States may not be substituted as the defendant, and the individual employee remains liable." *Id.* If it is correct, as the Court must assume in light of the *Lamagno* decision, that Congress did not intend the substitution of the United States for the individual employee to be final and non-reviewable upon the Attorney General's certification that the employee was acting within the scope of his employment, then it is equally true that Congress would have had no logical reason for mandating that an intentional tort case against the employee remain in federal court even after the district court makes a factual finding that he was not so acting within the scope of his employment. In other words, because Congress expressed no concern for protecting federal employees for anything but negligent acts taken within the scope of their employment, it would be illogical to think that it concerned itself with inventing an arbitrary and arguably unconstitutional basis for federal subject matter jurisdiction for intentional tort actions wholly unrelated to the scope of employment.

It must then be addressed what Congress intended by stating in § 2679(d)(2) that the "certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal." The answer does not seem to this Court to be as oblique as other courts have maintained. It means simply that neither

the originally named defendant employee nor the substituted defendant United States need adduce any other fact in order to remove the case to the federal district court. None of this language relates to absolute and continuing subject matter jurisdiction.

*First,* had Congress intended to state that "the certification of the Attorney General shall conclusively establish the federal court's subject matter jurisdiction," it certainly chose a strange way of saying so. Congress is well aware of how to vest jurisdiction with the federal courts. Indeed, Part IV of Title 28 of the United States Code, in particular chapters 81, 83, 85, 89, 90, 91, 95, 97 and 99, is devoted to this matter. Section 2679(d), by contrast, is included in Part VI of Title 28, which is devoted to the procedure to be used in "particular proceedings." It is not a jurisdictional statute, such as the federal question statute (§ 1331), the supplemental jurisdiction statute (§ 1367), the general removal statute (§ 1441), or the appellate court jurisdiction statutes (§§ 1291 & 1292), but is, rather, a statute which merely informs the Attorney General and the federal district court of how a particular cause of action is to proceed.

*Second,* the requirement that the Attorney General provide a certification that the defendant employee was acting within the scope of his duty merely displaces, for purposes of the United States' act of removal, the analogous provision in the general removal procedure statute, § 1446, that requires a defendant removing a case to federal court to provide "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." By making the certification "conclusive" for purposes of removal, Congress merely stated that the United States need do no more to establish the basis for the Court's

initial assumption of subject matter jurisdiction, but this language no more demonstrates that Congress made removal final than it does that Congress made substitution final. It merely refers to procedure, which otherwise would lie in § 1446(a).

*Third,* this reading is the only one that preserves the integrity of the holding in *Lamagno* and at the same time avoids the significant Article III question which at least five justices of that Court, along with the First and District of Columbia Circuits, have recognized.

At the end of the day, the more sensible reading of § 2679(d) is not that it replaces the provisions found at §§ 1441–1452, but that it overrides certain individual parts therein where necessary to accommodate the goals Congress sought to employ in response to the *Westfall* decision. For example, whereas § 1446(b) requires that notice of removal be filed within 30 days of receipt of service, § 2679(d)(2) requires removal only after the Attorney General has certified the scope of employment issue, something which can occur only after the Attorney General obtains knowledge of the action, as contemplated by § 2679(c). The fact that the statutes may overlap is of little consequence. Even in this case the United States cited § 1441 in removing the case, even though both § 1442 (which applies to civil suits against the United States and its agencies and officers) and § 2679(d)(2) provide more specific sources for its right to do so. The primary significance of § 2679(d) is that it replaces the permissive language of § 1441 and § 1442, which provide that qualified defendants "may" remove an action, by stating that where the Attorney General obtains knowledge of a suit against a federal employee stemming from an act taken within the scope of his employment, the action "shall" be removed. Congress made no mention of what should become of the case if the district court determined for itself

that the Attorney General's certification was in error, and this Court believes that the general remand statute, § 1447, becomes relevant in such an instance.

Because § 1447(c) requires the Court to remand any action where, at any time, "it appears that [it] lacks subject matter jurisdiction," *and*, because the basis for this Court's jurisdiction, which was the involvement of the United States, no longer exists, the Court is convinced that it lacks subject matter jurisdiction and may not retain the case. For the reasons stated above, there is no sensible reason to think that Congress intended it any other way, and there is, therefore, no reason to read the statute in a way which would require the Court to confront a significant Article III question by retaining jurisdiction of McKee's action against Quick, insofar as it stems from allegedly defamatory statements made outside the scope of her employment. *See Lamagno,* 515 U.S. at 437, 115 S.Ct. 2227 (O'Connor, J., concurring in part); *United States v. X–Citement Video, Inc.,* 513 U.S. at 78, 115 S.Ct. 464.

In all fairness, the Court will address one final matter that seems at first glance to stand out as inconsistent with this opinion, and which has bothered the Third, Fourth and Fifth Circuits, that being the fact that Congress specifically provided remand authority in § 2679(d)(3), but did not in (d)(2). As noted above, this Court is not as comfortable as the District of Columbia Circuit appears to be with simply saying paragraphs (d)(1)-(3) must be read to "work together," and that the express authority to remand in (d)(3) can therefore be implied into (d)(2). On the other hand, it does not disagree with the District of Columbia Circuit and the First Circuit that (d)(2) and (d)(3) can be harmonized. The Court's conclusion on this point derives from what it has already noted above. It finds that the harmony between (d)(2) and (d)(3) stems not from what (d)(2) implicitly states, but from what it does not state: it does not state that the Attorney General's certification of the scope of employment issue is conclusive for purposes of subject matter jurisdiction, or that remand is not permitted. Because Congress' sole intent in passing the Westfall Act was to preserve the immunity of individual federal employees sued for negligent acts undertaken within the scope of their employment, absolutely no indignity befalls the Act by remanding a case after a factual determination has been made that a federal employee named in the plaintiff's suit was not acting within the scope of his employment.[9] That paragraph (d)(3) is more specific than (d)(2) does not negate the logical meaning of the latter.[10]

---

**9.** The Court has considered but rejected the notion that 28 U.S.C. § 1367(a) might give it supplemental jurisdiction over the claims against Quick on the basis that they are part of the "same case or controversy" as the civil action against the United States. The defect in this notion is that at any given time, there has been only one set of claims, be it entirely federal in nature, as the United States argued, or entirely state in nature, as pled by McKee and as the Court has determined in finding that Quick acted outside the scope of her employment. The key point to be made is that at no single point in time did there exist both federal and state claims, such that the latter could be deemed "supplemental" to the former, and inherent in this observation is the fact that there is no federal claim at present to which the claims against McKee can be deemed "supplemental."

**10.** While one can argue that statutes should be construed so as to give every word and phrase meaningful effect, canons of construction, as Professor Llewellyn famously noted over a half-century ago, are of limited value. *See* Karl Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed,* 3 Vand. L.Rev. 395 (1950). The rule that statutes should not be construed as containing surplusage is, frankly, only helpful until that time when such a construction becomes unavoidable. *See id.; see also Chickasaw Nation*

### III. Conclusions of Law

With respect to the facts adduced in this case, the Court makes the following conclusions of law:

1. Quick did not act outside the scope of her employment in filing an assault complaint against McKee with the Wright Patterson security police on April 1, 1997, insofar as the assault complaint related to the confrontation between her and McKee which had taken place on March 27, 1997; to the extent Quick used her assault complaint to publish unrelated statements concerning McKee's treatment of her as a black woman, she acted outside the scope of her employment, as noted *infra* in the Court's Second Conclusion of Law.

2. Quick acted outside the scope of her employment when she (a) stated to Cathy Thomas that McKee had discriminated against her on the basis of her race; (b) submitted a statement to Sgt. Opsahl, of the Wright Patterson security police, that McKee had discriminated against her because of her being a black woman; and (c) made statements to her mother that McKee had treated her in a sexually and racially discriminatory manner.

3. To the extent Quick acted outside the scope of her employment, as noted in the Court's Second Conclusion of Law, the United States improperly substituted itself as the Defendant on her behalf; to this extent, Quick shall be re-substituted as the Defendant.

4. Insofar as McKee's civil action for defamation and intentional infliction of emotional distress, as originally stated against Quick, stems from her assault complaint she filed with the Wright Patterson security police, *for assault*, or from any other statements other than (a) her statement to Cathy Thomas that McKee had discriminated against her on the basis of her race; (b) her statement to Sgt. Opsahl

that McKee had discriminated against her because of her being a black woman; and (c) her statements to her mother that McKee had treated her in a sexually and racially discriminatory manner, the United States properly substituted itself as the Defendant under 28 U.S.C. § 2679(d)(2).

5. To the extent the United States properly substituted itself as the Defendant in this action, for the conduct of Quick other than (a) her statement to Cathy Thomas that McKee had discriminated against her on the basis of her race; (b) her statement to Sgt. Opsahl that McKee had discriminated against her because of her being a black woman; and (c) her statements to her mother that McKee had treated her in a sexually and racially discriminatory manner, McKee's claim is dismissed on the Court's own motion, for lack of subject matter jurisdiction, because, as he has acknowledged, he did not exhaust his administrative remedies against the United States pursuant to the Federal Tort Claims Act.

6. 28 U.S.C. § 2679(d)(2) does not bar this Court from remanding an intentional tort action against a federal employee after it has been determined that the employee was not acting within the scope of her employment.

7. To the extent McKee has been re-substituted as the Defendant, the Court lacks the basis for subject matter jurisdiction upon which the cause of action was removed to this Court, such that, to this extent, the cause must be remanded to Greene County Common Pleas Court.

The Court reminds the parties that nothing stated herein concerns the merits of McKee's action for defamation and intentional infliction of emotional distress against Quick, nor the merits of any defenses Quick may raise thereto, and that

*v. United States,* 534 U.S. 84, 122 S.Ct. 528, 535, 151 L.Ed.2d 474 (2001).

all such arguments on these issues, as well as arguments on the issue of punitive damages, remain intact for resolution in the Greene County Common Pleas Court, as does Allstate's separate claim for a declaratory judgment.

On the other hand, upon the case's reinstatement in the Greene County Common Pleas Court, McKee may only proceed against Quick within the parameters defined by this ruling, which is to say, he may not maintain his claims for defamation and intentional infliction of emotional distress to the extent they would concern facts other than (a) Quick's statement to Cathy Thomas that McKee had discriminated against her on the basis of her race; (b) Quick's statement to Sgt. Opsahl that McKee had discriminated against her because of her being a black woman; and (c) Quick's statements to her mother that McKee had treated her in a sexually and racially discriminatory manner. (Of course, as noted *supra*, the extent to which Quick's statements to her mother comes within the ambit of McKee's pleadings is an issue which may yet be argued and decided in the Greene County Common Pleas Court.)

The captioned cause is hereby remanded to the Greene County Common Pleas Court, Ohio, and ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.